987 A.2d 1168 (2010)
In re J.F., Appellant.
No. 06-FS-790.
District of Columbia Court of Appeals.
Argued September 11, 2009.
Decided January 28, 2010.
*1169 Alice Wang, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.
Todd S. Kim, Solicitor General, with whom Peter J. Nickles, Attorney General for the District of Columbia, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.
Before WASHINGTON, Chief Judge, KRAMER, Associate Judge, and NEWMAN, Senior Judge.
*1170 KRAMER, Associate Judge:
Appellant J.F. was charged with first-degree felony murder, second-degree murder, first-degree child sexual abuse, assault with a dangerous weapon (ADW) and second-degree theft. All of the charges, with the exception of second-degree theft, were related to J.F's younger sister, A.F.[1] The trial court found appellant "involved" on all counts except second-degree murder and ordered his commitment to a juvenile facility until his twenty-first birthday.[2] J.F. appeals, arguing that the trial court erred: (1) in excluding certain hearsay statements; (2) in finding his other younger sister, L.F., incompetent to testify; and (3) in finding his statements to the police neither custodial nor involuntary. J.F. also challenges the sufficiency of the evidence underlying the court's findings of guilt on the first-degree child sexual abuse, felony murder, and ADW charges. Finally, he argues that his adjudications for felony murder and first-degree child sexual abuse should merge. We conclude that J.F.'s confession of sexual assault was both custodial and involuntary and should have been excluded, and that the trial court's error in admitting that confession was not harmless. We also conclude that there was insufficient evidence to support the adjudication for ADW. We thus hold that J.F.'s adjudications for first-degree sexual abuse, felony murder, and ADW cannot stand. We remand for further proceedings consistent with this opinion.[3]

*1171 I. Facts
J.F. was convicted on March 2, 2006, after a four week bench trial. The facts most relevant to this appeal are as follows: At the time of arrest, J.F., a fourteen-year-old boy, lived with his grandmother, V.R., and three siblings: Jo.F (an eight-year-old boy), L.F. (a five-year-old girl), and A.F. (a four-year-old girl). L.F. and A.F. had moved in with J.F. and his brother Jo.F. only three weeks before the tragic events which led to this criminal case. On the night of September 14, 2004, V.R. came home to find A.F. lying on a bed in the children's shared bedroom and looking sick. A.F. told her grandmother that her stomach hurt. A.F. was weak and uncomfortable, "act[ing] like she wanted to fall down" and "wrap[ping] her legs around [V.R.]," so V.R. decided to take A.F. to the hospital. J.F. insisted on accompanying them to the hospital, but he did not offer any explanation as to why A.F. was ill. On the way to the hospital, A.F. tossed and turned in the backseat.
Around 3 a.m., after A.F. had been taken into surgery and V.R. and J.F. had returned home, emergency room physicians sought a consultation with Dr. Tonya Hinds, a pediatrician at the Children's National Medical Center and a medical school lecturer on sexual assault, because they "were concerned that [A.F.] had been physically abused or assaulted." While examining A.F., Dr. Hinds noted external injuries including bruising on the right side of the forehead, both arms, right thigh, both sides of the trunk below the nipples, and about fourteen circular lesions on her left thigh, each about four millimeters in diameter. A.F.'s internal injuries included lacerations to the liver, spleen, and pancreas; fractures of her left sixth through tenth ribs; and bruising to the left kidney.
As an expert in child abuse, Dr. Hinds felt the pattern of A.F.'s external injuries was significant because the injuries were "relatively symmetrical," creating "concern about someone punching her using perhaps a right and a left hand to both sides of her abdomen."[4] Though she could not definitively state whether the external injuries occurred at the same time as the internal injuries, Dr. Hinds felt comfortable assuming that this was indeed the case because "one does not walk around with a lacerated liver, spleen, pancreas, bruising to the kidneys and blood loss that was documented radiographically." In addition, Dr. Hinds found that A.F. had vaginal bleeding, circumvental discoloration and swelling around the anus, as well as loss of normal perirectal anal folds, which led her to consider sexual assault. Despite the fact that A.F. was suffering from disseminated intravascular coagulopathy (DIC), a clotting problem that exacerbates internal bleeding, Dr. Hinds testified that "nothing in [her] understanding of DIC [] would allow the vaginal mucosa to be bleeding before ... any other orifice ... and so that combined with [her] concern about her anal findings caused [her] to be concerned about sexual assault."
A.F. died of multi-system organ failure on the afternoon of September 16, 2004, approximately thirty-nine hours after being brought to the emergency room. Before A.F. died, the ER team performed many procedures to try and save her life, including operations to release the pressure and accumulation of fluids caused by *1172 DIC, the injection of fluids, blood products and drugs to attempt to stabilize her condition, and at least one resuscitation after her heart stopped, all of which subsequently complicated the medical experts' ability to definitively determine the nature of some of her injuries.
Medical Examiner Dr. Constance DiAngelo, an expert in forensic pathology, performed an autopsy on A.F. and determined that the cause of death was homicide by blunt force trauma. A.F. had bruises and abrasions scattered over her body, particularly her head (including her chin, forehead, the sides and back of the neck, the right earlobe, and scalp), chest, sides, hips, and back. She also suffered internal hemorrhaging within the anterior chest cavity, both sides of the back, and the buttocks  all injuries consistent with blunt trauma. The number of injuries and impact sites (at least twenty-three) were consistent with punches, kicks and stomps, not with a fall or an accident.
Dr. DiAngelo also described injuries to A.F.'s genital region. She could not determine whether the hemorrhaging in A.F.'s left labial and groin area was caused by blunt trauma or the insertion of a catheter during attempts to save her life; however, a contusion around the anus and a superficial abrasion both suggested blunt trauma in that area. Likewise, a hemorrhage that extended through the entire thickness of the wall above the anus and rectum, as well as tissue damage and hemorrhaging in the wall of the vagina and the wall of the bladder, suggested blunt trauma consistent with something being inserted into the anus and rectum.
Dr. Janice Ophoven, an expert in forensic pathology, with a speciality in pediatric forensic pathology, testified for the defense.[5] Dr. Ophoven deemed A.F.'s death a homicide, agreeing that A.F. "died of complications of blunt force trauma to the abdomen," but opining that the combined effects of abdominal compartment syndrome (ACS), wherein the blood enters the abdomen but cannot get out, and DIC caused the vaginal bleeding and distortion to the anus.[6] Dr. Ophoven disagreed that A.F. was the victim of sexual trauma, specifically observing that there was no tearing of the anal ring or laceration to the anus or rectum, as she testified there would certainly be in the case of sexual assault, and concluding that a finding of sexual assault "is not based on the current evidence in the case." She emphasized that, where a person bleeds as profusely as A.F. and is kept alive by injections of large amounts of fluids, "interpreting the pattern of injuries has to be done really, really carefully, and ... if there's not tears to the actual genital tissues that make a diagnosis of sexual injury obvious, in my opinion, ... you don't say sexual injury unless you can prove it because it has ... such horrible implications."
*1173 Jo. F, who was then almost ten years old, testified via closed-circuit camera that he was asleep in the room the children shared when J.F. "started beating my little sister [A.F.] up." He was awoken by A.F.'s screaming and ran downstairs to see "him hitting her with a belt and punching her in the face," stomach, and chest. Jo.F. tried to convince J.F. to tell their grandmother the truth when she returned home, but J.F. refused and threatened to hurt Jo.F. When Jo.F. was questioned by a police officer the next day, he claimed that A.F. fell down the stairs "[b]ecause [he] didn't want [his] brother to get in trouble."
The court also admitted a videotaped police interrogation of J.F., which we address in Part II, infra.

II. J.F.'s Interrogation
J.F. argues that the trial court erred in finding (a) that his police interrogation was not custodial,[7] and (b) that his confession to sexual assault was voluntary. We hold that while the first part of the interrogation, in which J.F. confessed to beating A.F., was not custodial, the second part of the interrogation, in which he confessed to sexually assaulting A.F., was custodial. Thus, the trial court erred in refusing to rule on the validity of J.F.'s "waiver" of his Miranda rights. We also agree that his confession to sexual assault was coerced.
J.F. was interrogated for approximately three hours by both Sergeant Parker and Detective Duvall on September 17, 2004. Sgt. Parker testified that he picked up J.F. in plain clothes and in an unmarked car. J.F. was never handcuffed and he waited on a couch in the station lobby before meeting with the child psychologist who informed him of A.F.'s death.[8] Because the trial court found Sgt. Parker credible and the court's findings have a basis in the record, we accept them as true. In re J.H., 928 A.2d 643, 648 (D.C.2007). The interrogation can be reasonably divided into two portions, each of which we address in turn.

1. J.F. Confesses to Beating A.F.
The first portion of the interrogation began at approximately 7:30 p.m. and lasted about seventy minutes. The officers spent the first several minutes of the interview establishing J.F.'s voluntary presence and his ability to leave.[9] When first questioned, J.F. reaffirmed the story he had previously told another officer  that A.F. fell down the stairs because he accidentally kicked her. Within approximately five minutes, however, J.F. changed his story and admitted that he accidentally hit A.F. while play fighting. While J.F. initially only admitted to tapping A.F. in the stomach, within half an hour of interrogation, he admitted to hitting A.F. "hard" on both sides of her body and he demonstrated by punching the detective's hand with obvious force and touching the detective on his sides to show where the "hooks" landed on A.F.[10] Despite his admissions, J.F. maintained *1174 that he hit A.F. "hard" without realizing she was there because he "kept swinging" his arms with his eyes closed.
Before ending the interview, the officers questioned J.F. about a possible sexual assault of A.F. by J.F. or another family member. J.F. said he did not think A.F. had ever been inappropriately touched and the officers did not push the issue. Sgt. Parker then asked J.F. if he "fe[lt] a little better when [you] tell the truth?" and J.F. responded, "Sure do." At 8:42 p.m., Sgt. Parker told J.F that they were concluding the interview and offered him a soda or water. As Sgt. Parker was leaving the room he asked, "You ready to go home ain't you?"

2. J.F. Confesses to Sexually Assaulting A.F.
Despite telling J.F. that he would be taken home, the officers resumed the interrogation and informed J.F. for the first time that the medical examiner had determined that A.F. had been sexually assaulted shortly before she was brought to the hospital. Sgt. Parker asked J.F. if he knew what "sexually assaulted" meant, and J.F. confirmed that he did. He then asked J.F. if he had sexually assaulted A.F. and J.F. said he had not. At this point, the tone of the conversation changed dramatically. Sgt. Parker moved much closer to J.F., and at times hovered over him. His voice was louder and more confrontational than at any point during the first half of the interrogation. In stark contrast to the first half, Sgt. Parker made clear that J.F. would not be going home until he confessed to sexually assaulting A.F., stating, "We can't figure out how she got the sexual assault injuries, so that's where we at now, before we let you go, you need to sit here and tell us how that occurred." (emphasis added)[11]
Sgt. Parker and Detective Duvall then utilized a combination of strategies to encourage J.F. to confess. They began by establishing that they were certain that J.F. had raped his sister, since only J.F.'s younger brother and other sister were home at the time of the alleged assault, and that J.F. was not going to be able to convince them otherwise. They repeatedly accused him of lying, saying "You did it. We think you did it," "Don't sit here and B.S. me," "You know and I both know that this occurred," and "You're telling a lie [J.F.], you're telling a lie. You tryna' (sic) f* * * your sister." The officers suggested that their only goal was to help J.F. show it was an accident so that he would not be prosecuted:
Maybe I'm using the wrong word.... You're fourteen years old. You're becoming a teenager, right? You got hormones. Maybe, while y'all was playing, your penis accidentally bumped up against her. Accident, okay? ... If it was an accident, tell me it was an accident, okay? But don't sit here and try to make me think that what the doctors and medical examiner are telling me didn't exist, when I know for a fact it did.
Sgt. Parker implied that J.F. would not be prosecuted if he confessed, saying "we ain't gonna lock you up when you tell us.... You need to sit here and work with me, so we can look at it and see if it was an accident and you can walk away from *1175 it." On the other hand, Sgt. Parker warned that J.F. would be known as a "sexual predator" if he continued to refuse to confess. Sgt. Parker further implied that any confession J.F. provided would be confidential, stating "Get it off your chest.... I'ma (sic) work with you, okay, ain't nobody going to say a word."
During the course of this two-hour interrogation, J.F. denied that he sexually assaulted his sister no less than sixty-three times. The more Sgt. Parker accused J.F. of lying, the more J.F. raised his voice and asserted himself against the officers, at one point yelling, "I DON'T KNOW! I DIDN'T DO IT!" When Sgt. Parker adopted a gentler, more encouraging approach, J.F. retorted, "Nah, it ain't gonna be all right you blaming me for something that I ain't do." When J.F. first conceded that an accident could have occurred, he adopted Sgt. Parker's words and prefaced all his statements with "probably." Sgt. Parker interrupted these equivocations to order J.F. to use his own words rather than using the officers' words, but when pushed to tell what actually happened, J.F. exclaimed "[h]ow I'm gonna tell you something I don't know?"
Finally, after varied and repeated attempts to coax J.F. into confessing, and J.F.'s many denials, J.F. confessed that his "medium" hard penis accidentally went in A.F.'s anus while they were wrestling on the bed. According to this version of the story, J.F. stumbled due to a spring in the mattress and fell on top of A.F. At that point, J.F. claimed, his penis accidently fell out of his pajama pants and penetrated A.F.'s anus, which was exposed because her nightgown had lifted up and the underwear she was wearing had "moved out of the way." Notably, many of the details in this version of the story had initially been provided by Sgt. Parker.

A. Custody
J.F. alleges that the entirety of his confession was custodial. "The determination whether a suspect was in police custody presents a mixed question of fact and law." In re I.J., 906 A.2d 249, 261 (D.C.2005). "[W]e will not disturb the trial court's factual findings unless they are clearly erroneous," In re J.H., supra, 928 A.2d at 648 (internal quotation marks and citation omitted), but "the trial court's determination that [J.F.] was not in custody for purposes of Miranda is ultimately a [question] of law that we review de novo." Id.
"Custody, for Miranda purposes, is present when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.... Thus, custody requires an inquiry into whether given [the] circumstances, [] a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." In re I.J., supra, 906 A.2d at 255-56 (internal quotation marks and citation omitted). Indeed, because "[t]he Miranda custody inquiry is an objective test," Yarborough v. Alvarado, 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), the Supreme Court has not held that a suspect's age or experience is relevant to the Miranda custody analysis, "much less mandated its consideration."[12]Id. at 666, 124 S.Ct. 2140. In fact, "[t]he only indications in the Court's opinions relevant to a suspect's experience with law enforcement have rejected *1176 reliance on such factors." Id. at 666-67, 124 S.Ct. 2140.[13] Importantly, "[a] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that ... the questioning took place in a `coercive environment,'" McFadden v. United States, 945 A.2d 1203, 1205 (D.C.2008) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)), or "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Graham v. United States, 950 A.2d 717, 730 (D.C.2008) (quoting Mathiason, supra, 429 U.S. at 495, 97 S.Ct. 711).
We agree with the trial court's determination that J.F. was not in custody during the first portion of the interrogation because a reasonable person would have felt free to leave. In re I.J., supra, 906 A.2d at 256. J.F. was not treated as if he were being arrested  he was never told that he was required to speak with the officers, he was not handcuffed, and he traveled to the station in an unmarked car with plainclothes officers. Mathiason, supra, 429 U.S. at 495, 97 S.Ct. 711; Graham, supra, 950 A.2d at 729; McFadden, supra, 945 A.2d at 1206. Prior to the interview, J.F. waited in the station lobby and was offered food and drink. McFadden, supra, 945 A.2d at 1206-07. Moreover, the officers explicitly told J.F. that he was not under arrest and that he was free to leave and they spent considerable time ensuring that he understood his rights before beginning questioning. Graham, supra, 950 A.2d at 729; McFadden, supra, 945 A.2d at 1206. Because a reasonable person in that situation would have felt free to leave, we affirm the trial court's determination that J.F. was not in custody during the first part of the interrogation.
We hold, however, that the second part of the interrogation was custodial. While "admissions of culpability ... do not establish the beginning of custody if the police never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial," Graham, supra, 950 A.2d at 730 (internal quotation marks and citation omitted), here the police did alter the circumstances of the interrogation by telling J.F., within a minute of resuming questioning, "[b]efore we let you go, you need to sit here and tell us how [A.F.'s sexual assault] occurred." The officers made it perfectly clear that J.F. was not free to leave,[14] a point underscored by the fact that J.F. was dependent on the officers for a ride back to his foster home in an unfamiliar part of the city.[15] Contrary to the previous session with J.F., in the second part of the interview the officers provided no assurances that J.F.'s presence was voluntary. Indeed, the officers' demeanor and tone distinctly shifted and became more confrontational and aggressive.
Given the officers' change in attitude and language and the approximately fifteen minute lapse between the first portion of the interview and the second, a reasonable person would feel that he was no longer free to leave. Thus, the trial court erred in holding that the entirety of the *1177 interview was noncustodial. See Graham, supra, 950 A.2d at 730.

B. Coerced Confession
J.F. also argues that his confession to sexual assault during the second portion of the interrogation was involuntary. We agree. Our finding that this portion of the interrogation was custodial, while not required for a finding of coercion, informs our determination.
"[A]n involuntary statement is inadmissible at trial for any purpose." Graham, supra, 950 A.2d at 735 (internal quotation marks omitted). "The test for determining the voluntariness of specific statements is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion." Graham, supra, 950 A.2d at 735-36 (internal quotation marks and citation omitted). In determining whether a defendant's will was overborne, we assess both the characteristics of the accused, specifically "the suspect's age, education, prior experience with the law, and physical and mental condition," and the details of the interrogation, specifically "its duration and intensity, the use of physical punishment, threats or trickery, and whether the suspect was advised of his rights." Id. at 736. In the case of juvenile confessions, the Supreme Court has instructed that courts should pay particular attention to "[t]he age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, [and] the callous attitude of the police towards his rights." Haley v. Ohio, 332 U.S. 596, 600-01, 68 S.Ct. 302, 92 L.Ed. 224 (1948). Importantly, while we consider the totality of the circumstances, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary...." Graham, supra, 950 A.2d at 736 (quoting Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).
In voluntariness determinations, the burden is on the government to prove by a preponderance of the evidence that a defendant's statements were made "freely, voluntarily, and without compulsion or inducement of any sort." Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); see also Graham, supra, 950 A.2d at 735-36. The government has conceded that "the questioning [in this portion of the interrogation] was insistent and persistent," but it argues nonetheless that this "does not show that the confession was the product of coercion." The trial court agreed that J.F.'s will was not overborne, specifically because the court found that J.F. did "not appear to be intimidated by the sergeant."
We defer to the trial court's factual findings, but analyze the voluntariness of J.F.'s confession de novo. Graham, supra, 950 A.2d at 735. While the evidence on this issue is far from one-sided, we ultimately hold that J.F.'s confession of sexual assault was involuntary. In reaching this conclusion, four factors are of particular significance: J.F.'s youthful age; the officers' clear indications to J.F. that he would not be leaving the interrogation room until he confessed to sexually assaulting his sister; J.F.'s sixty-three denials; and the fact that the majority of J.F.'s final confession was comprised of details that J.F. had adopted from the officers' suggestions.
J.F.'s individual characteristics, which the Supreme Court instructs us to consider, indicate susceptibility to coercion and require us to more carefully scrutinize the police interrogative tactics. At the time of the interrogation, J.F. was fourteen years old.[16] He was not shown to have any prior *1178 experience with the criminal justice system.[17] Moreover, he was in a vulnerable mental condition, both because he was informed of his sister's death shortly before the interrogation began and because he had been removed from his family and placed in foster care for the three previous days.[18] J.F.'s vulnerability was exacerbated by the fact that he was questioned for three hours, with only a brief break, in an interrogation that did not end until nearly eleven at night, and because no adult accompanied him to the police station to supervise the questioning or provide him a ride home when he wanted to leave.[19]
The government is correct that officers will sometimes "need to be aggressive in their investigation of crimes, especially heinous crimes" and in maintaining that the fact "that they are aggressive does not mean that a suspect's will was actually overborne." But here the officers' aggressive tactics, including repeated accusations, threats of invasive procedures,[20] and false promises of leniency[21] were not determinative. Rather, of more significance were J.F.'s sixty-three denials of committing the sexual assault before the officers were able to obtain a useable confession; the fact that the police clearly conditioned J.F.'s *1179 ability to leave on a confession despite the fact that he had not been formally arrested;[22] and the fact that most of the details of J.F.'s confession were initially provided by the officers, rather than J.F. Accordingly, we find that J.F.'s will was overborne and his confession to sexual assault was coerced.[23]
Admission of a coerced confession is an error of constitutional magnitude, in violation of the Due Process Clause. Arizona v. Fulminante, 499 U.S. 279, 288-89, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). This court has observed that "[a] confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." McCoy v. United States, 890 A.2d 204, 211 (D.C.2006) (quoting Fulminante, supra, 499 U.S. at 296, 111 S.Ct. 1246).[24] "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, supra note 3, 386 U.S. at 24, 87 S.Ct. 824 (1967). Here J.F.'s coerced confession was the only direct evidence of first-degree sexual abuse presented at trial other than medical testimony of sexual abuse, which was sharply disputed, thus we cannot find that this error was harmless beyond a reasonable doubt. Accordingly, we must vacate the adjudication for first-degree sexual abuse and the adjudication for felony murder predicated on that first-degree sexual abuse.[25]

VI. Further Proceedings
We vacate appellant's adjudications for first-degree child sexual abuse, holding that J.F.'s confession to the sexual assault was coerced and that the trial court's error in admitting that confession was not harmless. We vacate J.F.'s adjudication for *1180 felony murder because that charge was predicated upon the adjudication for first-degree sexual abuse which we vacate. We vacate J.F.'s adjudication for ADW because of evidentiary insufficiency. We remand to the trial court for further proceedings consistent with this opinion.
Where a conviction, or adjudication of delinquency, has been reversed on grounds other than evidentiary insufficiency, the prosecution has the right to bring the charges again and retry the case. See Fitzgerald v. United States, 472 A.2d 52, 54 (D.C.1984). Since the evidence was sufficient in this case, with the exception of the ADW charge, the Attorney General should inform the Superior Court and counsel for J.F. promptly if the government elects to retry the case.
There is an alternative. The offense of second-degree murder requires proof of malice, among other things. Comber v. United States, 584 A.2d 26, 39 (D.C.1990) (en banc). Where felony murder is concerned, malice is implied from the commission of the underlying felony. Id. Therefore, "[a]n indictment for felony murder... necessarily includes malice as an element of the offense and thus places the accused on notice that he is charged with the malice element of second-degree murder." Nelson v. United States, 601 A.2d 582, 594 n. 28 (D.C.1991). Here, more particularly, there was a separate count of second-degree murder which remained unresolved given the adjudication with respect to felony murder. See generally Fuller v. United States, 132 U.S.App.D.C. 264, 295, 407 F.2d 1199, 1230 (1968).
Given our reversal of the counts of felony murder and the predicate felony of first-degree sexual assault, the malice requirement for second-degree murder cannot be provided by "implication" as enunciated in Comber. There was, however, extensive evidence of J.F. beating A.F., which if credited by the fact finder, would be clearly sufficient to sustain a finding of the requisite "malice" as well as the other elements of that offense.[26] In past circumstances such as this, we have remanded to the trial court, providing it, as the fact finder, the opportunity to "weigh the evidence in the record afresh and render a new verdict." See, e.g., Grayson v. United States, 953 A.2d 327, 328 (D.C.2008) (per curiam) (citing Shewarega v. Yegzaw, 947 A.2d 47, 54 (D.C.2008)).
If the Attorney General of the District of Columbia elects to forego re-prosecution of felony murder and sexual assault, the trial court, as fact finder, shall determine whether the elements of second-degree murder, including malice, have been proven on the record of the previous trial. It should then enter a new adjudication and disposition for J.F.
So ordered.
NOTES
[1] J.F.'s theft charge was for taking $32 from his foster father's jogging pouch two days after A.F. died. He does not challenge his adjudication for second-degree theft.
[2] Having found J.F. "involved" in felony murder, the court made no ruling on the separate count of second-degree murder, which is also a lesser-included offense of felony murder. See Towles v. United States, 521 A.2d 651, 658 (D.C. 1987) (en banc).
[3] In light of this disposition, we need not dwell at length on the first two issues J.F. raises: (1) the exclusion of certain hearsay statements (a social worker's report containing statements made by J.F.'s grandmother to medical personnel), and (2) the competence of L.F. to testify. Error with respect to L.F.'s competency to testify, if any, was primarily relevant to the alleged sexual assault, and thus was clearly harmless with respect to the offense of second-degree murder, whether viewed under the standard of Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Though the exclusion of the grandmother's hearsay statements may have been relevant to an adjudication for second-degree murder, we also hold the erroneous exclusion, if any, to be harmless under the Kotteakos standard. Kotteakos, supra, 328 U.S. at 765, 66 S.Ct. 1239. (Contrary to appellant's assertion, any error in the exclusion of the hearsay statements would not be of constitutional magnitude and would not be analyzed under the Chapman standard. Chapman, supra, 386 U.S. at 24, 87 S.Ct. 824.) We are convinced that the judgment would not have been substantially swayed by any error, in light of the plethora of evidence presented against J.F. with respect to the second-degree murder charge, including J.F.'s confession to the police that he repeatedly hit A.F. and the corroborating eyewitness testimony of his brother. Moreover, the evidentiary value of the statement in question was minimal because it was cumulative of another witness's testimony. The statement was also inherently unreliable as it was made in the middle of the night by a distressed family member and conveyed through multiple people. See Kotteakos, supra, 328 U.S. at 765, 66 S.Ct. 1239.
However, there is merit to J.F.'s claim of evidentiary insufficiency to support the adjudication for ADW. The evidence is in fact insufficient to support the conclusion that the fourteen lesions on A.F.'s thighs were inflicted with J.F.'s studded belt and that J.F. was the one who used the belt to inflict the injuries. (These injuries were inflicted at least twenty-four hours before the fatal beating and were not among those which caused A.F.'s death.) See Rivas v. United States, 783 A.2d 125, 134 (D.C.2001).
[4] Contrary to J.F.'s statements to police that A.F. fell down the stairs, Dr. Hinds opined that A.F.'s injuries were not consistent with a fall down the stairs because "the injuries that we see after a household fall down the stairs generally involve minor and superficial injuries to the head and neck ... in A.F.'s age group.... [But her] injuries essentially involved abdominal injuries."
[5] Her opinion was based on the autopsy report, autopsy photographs, glass slides of the forensic histopathology from the medical examiner's office, medical records, investigative police records, witness statements, emergency room documents, x-rays, and operative reports from the hospital. Notably, the trial court did not credit this expert's testimony, finding the "testimony to be more that of an advocate than an expert."
[6] Dr. Ophoven specifically testified that A.F. died from a loss of blood pressure when all of the blood in her body flowed into her stomach, causing "the pressure from inside the belly [to be] reflected in the massively swollen tissues of her genitals and hemorrhage into the tissues around her vagina, and her anus and her rectum." Dr. Ophoven noted that this massive hemorrhaging was not exclusively in the genital regions, that "there [was] hemorrhage all over here ... coming from the inside and pushing out," but emphasized that the genital regions are the only parts of the pelvic and abdominal region that are externally visible.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] J.F. declined counseling or any other help from the psychologist.
[9] As the trial court found, J.F. agreed to be videotaped and was given Miranda warnings. Sgt. Parker told J.F. that he was present voluntarily, that he was not under arrest, and asked him if he understood that he was not under arrest, to which J.F. replied, "yes." Sgt. Parker then told J.F. that he would take him back to his foster parents' home after they finished their discussion, and J.F. indicated that he understood. Sgt. Parker went over the Miranda warnings line by line with him, emphasizing that he was not under arrest, and then repeated, "I'll say again [J.F.],... anytime you want to get up and walk out, you can walk out, you understand that?"
[10] No one had yet told J.F. that A.F. had been injured on both the right and left sides of her body.
[11] This message was reiterated several times during the next two hours, with Sgt. Parker warning, "You need to just go ahead and tell me so I take you back to your foster parents' house," and "I'll take you back to your foster parents, you understand me, but you're gonna have to sit here and be honest with me," and "[y]ou need to just go ahead and tell me so I take you back to your foster parents' house," and "you was almost out the door [before you started lying]."
[12] See also In re J.H., supra, 928 A.2d at 650 ("Nor does his age require suppression. `The Supreme Court has not definitively ruled on whether a suspect's youth is part of the objective Miranda custody analysis.'" (quoting In re I.J., supra, 906 A.2d at 262 n. 12)); United States v. Little, 851 A.2d 1280, 1285-86 (D.C. 2004) (citing Alvarado, supra, 541 U.S. at 666-67, 124 S.Ct. 2140).
[13] See also Little, supra, 851 A.2d at 1286 n. 7 (noting that the Alvarado court "concluded that the Ninth Circuit's reliance on Alvarado's inexperience with law enforcement was `improper' under the objective Miranda test even when reviewed `as a de novo matter'").
[14] See Part II. 2. of this opinion, and footnote 11 in particular.
[15] J.F. grew up in the Southeast quadrant of the city and was being interrogated at the police headquarters in the Northwest quadrant, but his foster home was in an unfamiliar neighborhood in Northeast, to which he had no practical means of returning in the middle of the night without a ride from the police.
[16] The Supreme Court held the interrogation of a fifteen-year-old boy involuntary in In re Gault because police tactics "which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces.... He needs counsel and support if he is not to become the victim first of fear, then of panic." 387 U.S. 1, 45-46, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). See also Catlett v. United States, 545 A.2d 1202, 1208 n. 9 (D.C.1988) (highlighting "the closer scrutiny given to the circumstances surrounding juveniles' statements, and the increased importance placed upon their age and experience [as opposed to those of adults]," and listing this court's precedent establishing a juvenile's youth as an important factor in the voluntariness analysis).
[17] See Davis v. United States, 724 A.2d 1163, 1168 (D.C.1998); Beasley v. United States, 512 A.2d 1007, 1013 (D.C.1986).
[18] In Murray v. Earle, 405 F.3d 278 (5th Cir.2005), the Fifth Circuit held the confession of an eleven-year-old girl involuntary where she had been removed from her home and placed in foster care for three days and confessed to murder after a two hour interrogation. In its voluntariness analysis, the Fifth Circuit emphasized the appellant's youth, her lack of experience with the criminal justice system, the fact that she had been in foster care for three days prior to the confession, the fact that she was not accompanied by an adult during the interrogation, and the fact that she was never told she was free to leave. Notably, the appellant in Murray had waived her Miranda rights, but the Fifth Circuit did not find this determinative.
[19] See Murray, supra note 18, 405 F.3d at 288.
[20] Sgt. Parker threatened "[we'll] get the sex squad here, okay, take some saliva and stuff from you, and you'll make this worse than it is" and "I'm going to take you up to sex squad and you're gonna get a sex scan ... you know that little juice stuff that runs off your penis, okay, and the private part, and see why [you] gonna put yourself through that?" Notably, these were empty threats because, at the time of this interrogation, a rape kit examination had not been conducted on A.F. and no physical evidence from the alleged perpetrator was ever obtained. See United States v. Lopez, 437 F.3d 1059, 1065 (10th Cir.2006) (confession involuntary partly because the police misrepresented the strength of the evidence).
[21] See relevant quotes in Section II. 2., supra. See also Beasley, supra note 17, 512 A.2d at 1016 ("[W]e do not condone certain of the tactics used by the police in this case [promise of leniency and deception concerning strength of the government's evidence], and such tactics have made this a close case."); United States v. Rogers, 906 F.2d 189, 191 (5th Cir. 1990) (confession involuntary partly due to assurance that defendant would not be arrested if defendant cooperated); Lopez, supra note 20, 437 F.3d at 1064-65 (confession involuntary because of implied promise to defendant that prison sentence would be fifty-four years lighter if he confessed).
[22] The government claims that the evidence does not support J.F.'s assertion that he knew he would not be taken home until he confessed. After reviewing the videotape and transcript of the confession, we cannot agree. See Section II. 2. and footnote 11 of this opinion for relevant quotes from Sgt. Parker.
[23] The government makes much of J.F.'s demeanor during the interrogation, arguing that "the suspect's behavior and demeanor is the best, most direct evidence of [coercion]." Plater v. United States, 745 A.2d 953, 962 (D.C.2000) (deferring to the trial court's "observ[ation] that [a suspect's] disposition appeared comfortable on the videotape"); see also Beasley, supra note 17, 512 A.2d at 1016 ("[W]e believe that appellant's own behavior during the interrogation indicates that the officers' statements were not sufficient to coerce a false confession."). We agree that the suspect's behavior is an appropriate consideration and that J.F. did not present himself as a timid individual. We nevertheless note that a suspect's demeanor is susceptible to many interpretations and cannot be held determinatively against him. For instance, the fact that J.F. raised his voice with Sgt. Parker when repeatedly accused of sodomizing his sister could be attributed to his increasing frustration with being wrongly accused just as easily as to his strong will.
[24] In Arizona v. Fulminante, the Supreme Court stated that "[a]n involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors  in particular cases it may be devastating to a defendant  but this simply means that a reviewing court will conclude in such a case that its admission was not harmless error...." Fulminante, supra, 499 U.S. at 312, 111 S.Ct. 1246.
[25] Appellant also argues that his adjudications for first-degree sexual abuse and felony murder should be vacated because there was insufficient evidence to sustain them. We reject this argument because the evidence was in fact sufficient when the confession to sexual assault was included in the analysis. See Hicks-Bey v. United States, 649 A.2d 569, 583 (D.C. 1994) ("[E]ven improperly admitted evidence may be considered in evaluating the sufficiency of the evidence." (citing Lockhart v. Nelson, 488 U.S. 33, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988)).
[26] See generally D.C.Code § 22-2103 (2009); see also Fisher v. United States, 749 A.2d 710, 713 (D.C.2000) (articulating the standard mens rea instruction for second-degree murder to include "act[ing] in conscious disregard of an extreme risk of death or serious bodily injury to decedent").