# District of Columbia
# Court of Appeals

**Nos. 13-CF-0085, 13-CF-0096 & 13-CF-0105**



FILED

MAR - 3 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

THEODORE R. SPENCER, *et al.*,

Appellants,

v.

CF1-12761-11;
CF1-12768-11;
CF1-12769-11

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge*; THOMPSON, *Associate Judge*; and PRYOR, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed, in part, and remanded to the trial court for merger of the convictions in accordance with this opinion.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 3, 2016.

Opinion by Senior Judge William C. Pryor.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CF-0085, 13-CF-0096 & 13-CF-0105

THEODORE R. SPENCER, *et al.*, APPELLANTS,

FILED 3/3/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

v.

UNITED STATES, APPELLEE.

Appeals from the Superior
Court of the District of Columbia
(CF1-12767-11, CF1-12768-11 & CF1-12769-11)

(Hon. Thomas J. Motley, Trial Judge)

(Argued October 1, 2015                                    Decided March 3, 2016)

*Thomas D. Engle* for appellant Theodore Spencer.

*Joshua Deahl*, Public Defender Service, with whom *Christine A. Monta*, *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant Terrell Wilson.

*Craig N. Moore* and *Betty M. Ballester* for appellant Phillip Charles Swan.

*James A. Ewing*, Assistant United States Attorney, with whom *Ronald Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Vinet Bryant*, and *Michelle Bradford*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, THOMPSON, *Associate Judge*, and PRYOR, *Senior Judge*.

PRYOR, *Senior Judge*: Appellants Theodore Reginald "Reggie" Spencer, Terrell Wilson, and Phillip Swan appeal their convictions stemming from events that occurred over two days in June 2011, which culminated in the brutal killing of Mr. Glenn Scarborough. Each appellant challenges his convictions on multiple grounds; we address each in turn. Appellants argue that in the event of affirmance by this court, merger is necessary for some of their convictions, and the government agrees. We affirm, in part, and remand for merger of certain convictions in accordance with this opinion.

## I. Facts

In June 2011, Sharon Spencer was in Georgetown University Hospital dying from cancer. Her son, Reggie Spencer, at least partially blamed his mother's long-time companion, Glenn Scarborough, for his mother's worsening condition. Scarborough and Sharon Spencer had a complicated relationship that included drug use, prostitution, and physical abuse.

On Friday, June 17, 2011, appellant Spencer received a telephone call from his grandmother notifying him that his mother's condition was not good, and that he should come see her at the hospital. Spencer, who lived in Orange County,

Virginia, was accompanied to Georgetown Hospital by his sister Jasmine Spencer,[1] appellants Wilson and Swan, Devon Horner, and Heather Swan. Spencer drove the group from Culpeper, Virginia to the District in Swan's car. At the hospital, Spencer and his sister Jasmine visited their mother in her hospital room. After the visit, Spencer was "upset, distraught, and crying." Spencer told the group that he wanted to go to Mr. Scarborough's house and "beat up him up." The group departed the hospital and, utilizing the car's global positioning system, Spencer drove the group in Swan's car to Scarborough's house. When they arrived, Spencer, Wilson, and Horner exited while Swan, Heather, and Jasmine remained in the car. Spencer knocked and Scarborough answered the door naked. Appellant Wilson, who had a gun, ordered Scarborough to get on the floor. Thereafter, Spencer and Wilson tied Scarborough up and beat him, leaving him tied up and naked on his basement floor. When the three returned to the car, approximately ten to fifteen minutes after they had left, they had a small black bag and were counting money from it. The six all drove back to Virginia together.

---

[1] For clarity throughout this opinion, because several people share last names, we refer to Jasmine Spencer and Heather Swan by their first names and appellants by their last names.

Early in the morning on June 18, 2011, Terrance Dupree, Scarborough's upstairs neighbor, heard Scarborough shouting for help outside of Dupree's front door. Upon opening it, Dupree found Scarborough naked with his hands tied behind his back. Dupree brought Scarborough to the kitchen where he used a knife to cut the rope and free Scarborough's hands. Scarborough told Dupree that he had been robbed but did not call the police.

Later in the day on June 18, 2011, Spencer, Wilson, and Swan were together again, along with Heather and Jasmine, when Spencer received another phone call from his grandmother summoning him to the hospital. Again, the group rode to Georgetown Hospital in Swan's car, with Spencer driving.[2] Spencer and Jasmine again visited with their mother in her hospital room while the others waited. This time, Sharon Spencer had worsened; she was unresponsive, and after their visit appellant Spencer was angry and wanted to return to Scarborough's house. Again, the group drove in Swan's car to Scarborough's house. This time, all but Heather got out of the car. Jasmine knocked and Scarborough answered the door. At first, the group discussed picking up some of Sharon Spencer's belongings but soon the situation escalated and Scarborough called Jasmine a vulgar term. At that time, Spencer told Jasmine to go back to the car. Jasmine complied, and on her

---

[2] Horner was not present on June 18th.

way out, she heard Scarborough say, "ah shit, not this again" and saw Swan and Wilson kicking and punching Scarborough as Spencer choked him.

About ten minutes later, the three appellants came back to the car where Jasmine and Heather were waiting. Spencer was wearing gloves and holding a bloody knife. Wilson said, "He's not going to hurt your mom no more." Spencer drove the group back to Orange County, Virginia; on the way, the knife and bloody gloves were thrown out of the window. The next day, the group was together again when they saw a news report about Scarborough's murder. Spencer and Swan admitted to Heather that they had killed Scarborough. Spencer told Jasmine that he had strangled and stabbed Scarborough while the others "beat him up."

On Sunday June 19, 2011, Scarborough was found face down in a pool of his own blood inside his basement apartment in Northeast Washington. His head and feet were wrapped with duct tape, a cloth was stuffed into his mouth, a belt was around his neck, and he had three superficial stab wounds. Mr. Scarborough had numerous abrasions and bruises, and he had ligature marks around his neck. The duct tape on his head obstructed his right nostril and the cloth in his mouth obstructed the other. The medical examiner determined that Mr. Scarborough died from asphyxiation due to ligature strangulation and suffocation.

Following the killing, each of the appellants implicated himself in the crime. Appellant Swan exchanged incriminating text messages with a friend; that friend contacted the Metropolitan Police Department and identified Spencer and Swan as persons who were involved. The government obtained videotaped statements from each appellant implicating himself in the death, and both Spencer and Wilson implicated himself in the assault on the night prior. All three appellants took responsibility for duct taping Scarborough, and Spencer and Swan each said he threw the knife and gloves out of the car window during the ride home.

At trial, appellants Wilson and Swan did not present a case. However, Spencer testified to his role in the killing, saying that he put Scarborough in a chokehold for nearly two minutes, wrapped a belt around his neck and pulled until it broke, stabbed him three times in the neck, and wrapped the duct tape around both Scarborough's head and legs. Spencer testified that he was "in a rage" and had never "been as angry in his life." He also testified that neither Swan nor Wilson was involved in the killing.

The jury convicted the appellants as follows: for the events on June 17th Spencer and Wilson were found guilty of burglary, kidnapping, and simple assault.

The jury also found Spencer guilty of robbery on June 17th.  For the events on June 18th, the jury convicted Spencer, Wilson, and Swan of burglary and kidnapping.  In addition, all three appellants were convicted of felony murder.[3]

## II.    Appellants' Statements to Police

Both Spencer and Wilson challenge the admission of their un-*Mirandized* statements.  Spencer argues that his Fifth Amendment rights were violated when the court admitted his videotaped confession which was made during custodial interrogation without the benefit of *Miranda* warnings.  Wilson argues that his Fifth Amendment rights were violated in the same way as Spencer's, but also that his statement was the product of an unlawful seizure in contravention of the Fourth Amendment.

The Fifth Amendment of the United States Constitution provides that "No person . . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  In 1966, the Supreme Court established the

---

[3]    Each appellant was also convicted of conspiracy, and Spencer was convicted of carrying a dangerous weapon outside the home.

now-familiar *Miranda* doctrine to "secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* holds that in a criminal prosecution the government may not use statements obtained as a result of custodial interrogation unless the police first advise the accused of his *Miranda* rights and obtain a valid waiver. *See id*. Neither Spencer nor Wilson was advised of his *Miranda* rights and the government concedes that the questioning of both rose to the level of interrogation. Therefore, the crucial *Miranda* inquiry is whether the appellants were in custody when they gave their statements.

For *Miranda* purposes, the test for "custody" is whether a reasonable person in the position of the suspect would feel there was a restraint on her freedom of movement to the degree associated with formal arrest. *See In re J.F.*, 987 A.2d 1168, 1175 (D.C. 2010). The test is an objective one, and must take into account the totality of the circumstances. *See id.* Thus, a custody determination "requires an inquiry into whether given [the] circumstances, [ ] a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (citations omitted). Whether or not a suspect was in *Miranda* custody is a question of law that this court reviews de novo. *See id*.

<u>Appellant Spencer</u>

Spencer argues that he was in custody for *Miranda* purposes at the time he gave his statement to police without the benefit of his *Miranda* rights, and that therefore, the trial court erred in admitting his statement.

Spencer first encountered the police in connection with the Scarborough murder when officers executed a search warrant on appellant Swan's home. Spencer was present during the execution of the search warrant, and was directed to wait in the living room while the search was conducted. Spencer testified that he did not believe he was under arrest when he was directed to wait in the living room but that he eventually thought he was under arrest when the police began to take photographs of him, including close-ups of his tattoos. During the execution of the search warrant, no one told Spencer he was under arrest. When Spencer asked Detective Clingerman, who was conducting the search warrant, what was going on, the detective replied, "We'll gladly explain that to you at the sheriff's office." Spencer was escorted to the police station in the back of Officer Kennon's police cruiser. At the station, Spencer gave a statement implicating himself in the murder of Mr. Scarborough.

Spencer argues that he was in custody when he gave his statement because he was taken to the police station in the back of a police car (which he was locked in and only the officer could open), because he was frisked prior to entering the vehicle, and because he was taken through a non-public entrance at the police station and was never left alone after arrival. When Spencer asked to use the bathroom, he was escorted there by a police officer. When Spencer asked to smoke a cigarette he was allowed to do so, but was again escorted by a police officer. Spencer argues that these factors, combined with the fact that the entire encounter began when his freedom of movement was curtailed by the execution of the search warrant at appellant Swan's residence, led to his reasonable belief that he was in custody and not free to leave.

A review of our precedent, as well as the addition of other facts not argued by Spencer, leads to the conclusion that Spencer was not in custody when he gave his statement to police. A person is not per se in custody for *Miranda* purposes during the execution of a search warrant even though he is not free to leave until after the search is complete. *See Quintanilla v. United States*, 788 A.2d 564 (D.C. 2002). Spencer was never handcuffed or restrained in any way. Spencer was taken to the police station by Officer Kennon because he did not have his own vehicle and Spencer wanted an answer to his question about what was going on.

The trial court found that this trip was voluntary. Officer Kennon did frisk Spencer, but did not handcuff him; Officer Kennon testified that he frisks anyone who rides in his car. Lack of physical restraint can create strong indicia of lack of custody. *See, e.g.*, *Morales v. United States*, 886 A.2d 67, 72 (D.C. 2005) (finding that the fact that suspect was not handcuffed weighed against custody); *Castellon v. United States*, 864 A.2d 141, 154 (D.C. 2004) (holding that presence or absence of handcuffs is a significant factor in the custody analysis).

Even once Spencer reached the police station for questioning there were no indicia of custody. Spencer was told that he was not under arrest. Simply being questioned in a station house is not enough to convert a voluntary encounter into one that requires *Miranda* warnings. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Spencer was taken outside to smoke under no physical restraint; he even testified himself that he considered fleeing while outside. There is no indication that the interactions between Spencer and the police were anything less than cordial. We conclude that a reasonable person in Spencer's position at the time he gave his statement to police would have felt free to end the encounter and leave. Accordingly, we hold that appellant Spencer was not in custody for *Miranda*

purposes at the time he gave his statement and that the trial court did not err in admitting it.[4]

Appellant Wilson

Appellant Wilson also argues that he was in custody when he gave his statement to police without the benefit of *Miranda* warnings. He further contends that his statement was the product of an unlawful seizure. Therefore, Wilson argues, his statement should not have been admissible at trial.

Wilson's encounter with the police in connection with the Scarborough murder began on July 6, 2011, when his girlfriend Jasmine received a call from an Orange County police officer saying that he needed to meet up and talk with her. Jasmine agreed to meet with the officer at nearby Yowell Meadow Park, and Wilson accompanied her to the meeting. Soon after the two arrived at the park, two or three Culpeper police officers arrived in separate cars. After confirming Jasmine's identity and asking her to come with them to the police station, the

---

[4] Spencer did not argue in his brief that but for the admissible confession he would not have testified. However, at oral argument, his counsel raised that possibility. We recognize such an argument could affect a harmless error analysis if we had found a *Miranda* violation, but reiterate that we find no error here. *See Chapman v. California*, 386 U.S. 18, 24 (1967).

police learned Wilson's identity. Once the police learned Wilson's identity, a uniformed officer told him, "We need you to come with us." Wilson complied, and without objection, both Wilson and Jasmine were transported separately to the Culpeper police station and then together to the Orange County police station for questioning. When they arrived at the Orange County police station, the officers left Wilson and Jasmine in the lobby and told them "that they needed to wait there." At some point, Detective Corbett came out to get Wilson; he told Wilson that he was not under arrest but that he'd like to talk to him. After waiting in another room for thirty or forty-five minutes, Detective Corbett escorted Wilson into an interrogation room and closed the door.

Corbett began to interrogate Wilson about the Scarborough death; he told Wilson he knew he was involved, he scolded Wilson for "playing games," and told Wilson that he was about "to get himself in a whole lot of trouble." Detective Corbett then advised Wilson that "if you want to walk out of here, you got to be honest." Wilson asked Corbett if he was being arrested and taken to D.C., to which Corbett responded that it "depends on what happens when I get out of here." Corbett told Wilson that after their interview he would call an attorney who would "let [him] know what to do with [Wilson]." Detective Corbett also referred to Wilson's girlfriend Jasmine when he told Wilson, "She's in it. She's in it too. . . I

hate to see her get a murder beef but she can and she will." Thereafter, Wilson made a statement to police implicating himself in the killing of Scarborough. Wilson was allowed to leave after giving his statement.

Wilson contends that he was seized within the meaning of the Fourth Amendment when the police told him he "needed" to come to the police station. The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures" by the government. U.S. CONST. amend IV. The seizure of a person for purposes of interrogating him at a police station is not allowed absent a warrant or probable cause. *See Dunaway v. New York*, 442 U.S. 200, 216 (1979). Evidence obtained in contravention of the Fourth Amendment is inadmissible at trial. *Id*. at 218-19. A seizure occurs within the meaning of the Fourth Amendment when an "individual's liberty is restrained by physical force or a show of authority." *Brown v. United States*, 983 A.2d 1023, 1025 (D.C. 2009) (citations omitted). "The focus of the 'seizure' inquiry is whether, under all the circumstances, a reasonable person would have believed that [she] was not free to leave." *Id*. The Fourth Amendment seizure inquiry examines the actions of the police; ultimately, the inquiry is: would the officer's display of authority or use of physical force cause a reasonable person to believe they were not free to leave.

The trial court held, and we agree, that Wilson was not seized in the park. There was no show of authority by the officers who arrived at the park to meet Jasmine. No guns were drawn, no one was handcuffed, and no one was threatened. Wilson's agreement to go down to the station appears to have been completely voluntary and perhaps precipitated by his desire to support his girlfriend, which also seems to be the reason for his presence in the park in the first place. We conclude that a reasonable person would have felt free to leave by simply telling the officers that he did not want to come down to the station to talk. Wilson chose the opposite.

Alternatively, Wilson argues that if he was not seized at the park, he was seized when Detective Corbett told him that his ability to leave was conditioned on him making a statement and being honest. The government argues that Wilson's interpretation of Detective Corbett's statement that "if you want to walk out of here, you got to be honest" is incorrect. Putting that statement in context provides guidance. Although it is clear that Wilson was being interrogated by Detective Corbett at the police station that day, it appears as though Wilson was there voluntarily, and was given many indications by the police that he was free to leave. Wilson was told by Detective Corbett before ever being escorted into the interrogation room that he was not under arrest. Wilson was still permitted to use

his cell phone, he was never handcuffed, and he was told multiple times that he was not under arrest. Under those circumstances, a casual statement like, "if you want to walk out of here, you got to be honest" is better interpreted as a prompting of honesty from Wilson with the idea that if he was honest he would better his chances of avoiding charges. Detective Corbett's indication that he would make a telephone call to an attorney before Wilson left, and be told "what to do" with Wilson based on what Corbett told the attorney on the call, was likewise not enough under the circumstances to make a reasonable person feel unfree to leave. In fact, Corbett had, immediately prior, indicated again that Wilson was not under arrest "right this minute." We conclude that, given the behavior of the police during Wilson's interrogation, a reasonable person in Wilson's position would have felt free to leave.

Wilson also argues that he was in custody for *Miranda* purposes at the time he gave his statement, and because he was not advised of his *Miranda* rights his statement should not have been admitted at trial. While the relevant factors in a seizure inquiry and a *Miranda* custody determination may be very similar, the threshold for *Miranda* custody is not the same as seizure under the Fourth Amendment. "Custody," for *Miranda* purposes, is present when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a

formal arrest." *In re I.J.*, 906 A.2d 249, 255 (D.C. 2006) (citation omitted). The fact that Wilson was not seized for purposes of the Fourth Amendment, does not necessarily take the encounter out of the *Miranda* context. *See id.* at 257 ("although an encounter between the police and a suspect may not necessarily be deemed an arrest—requiring probable cause—within the meaning of the Fourth Amendment, the same encounter may nevertheless be custodial and require *Miranda* warnings when assessed against the different goals of the Fifth Amendment."). While the seizure inquiry focuses on the actions of the police, the *Miranda* inquiry focuses on "how a reasonable person in the suspect's situation would perceive his circumstances." *Id.* (citation omitted).

In this case, we find that Wilson was likewise not in custody at the time he made his incriminating statement to police. Wilson was never handcuffed, he was told he was not under arrest, and he was allowed to use his cell phone to make sleeping arrangements for the night. Those facts are all indicia of an ability to leave, and not of a restraint on freedom of the degree associated with a formal arrest. Wilson spoke to Detective Corbett voluntarily, and gave a statement once

Detective Corbett began discussing the potential charges against Wilson's girlfriend Jasmine.[5]

A reasonable person in Wilson's position would have felt free to end the encounter and leave. We hold that appellant Wilson was neither in *Miranda* custody nor seized for Fourth Amendment purposes when he gave his statement to police and that the trial court did not err in admitting the statements.

## III. Kidnapping

Each appellant argues that his kidnapping convictions cannot stand because the evidence presented did not meet the definition of a kidnapping within the

---

[5] In addition to Fourth Amendment and *Miranda* violations, Wilson raises the specter of coerciveness in the interrogation tactics. In our recent case *Little v. United States*, 125 A.3d 1119 (D.C. 2015), in which we ruled that a confession should have been excluded because of the coercive nature of the interrogation tactics, this court reaffirmed our commitment to the voluntariness of confessions, and pointed to a distinction between two types of interrogation tactics—those related to evidence of the suspect's guilt, and those that "exert pressure on extrinsic grounds." *Id*. at 1130 n.11. The court warned of use of the latter category because they could induce a completely innocent person to confess because of the extraneous adverse consequences. *Id*. at 1130 n.11. While we recognize that the tactic of telling Wilson that his girlfriend Jasmine "can and []will" "get a murder beef" and that Wilson had the power to "keep her ass out of jail" is a tactic that exerts pressure on external grounds, we think in this case that tactic did not have an actual coercive effect on Wilson.

District's statute.[6] The crux of appellants' arguments is that kidnapping must involve a detention for an appreciable period of time beyond that incidental to another crime, and that their crime did not include any detention of Scarborough beyond that incidental to the assault and homicide. While we recognize a trend in kidnapping law that favors the appellants' arguments, because of our recent decision in *Richardson v. United States*, 116 A.3d 434 (D.C. 2015), as a panel of this court, we are constrained by *M.A.P. v. Ryan*, 285 A.2d 310, 321 (D.C. 1971), to decide against them.

While we must find against the appellants on their kidnapping arguments, because of the vast change that the concept of kidnapping has undergone since common law, and our recognition of a trend away from the District's current conception, a discussion of the current status of kidnapping in this jurisdiction is warranted. Kidnapping originated as the common law crime of "forcible abduction" or "stealing away" of a person from one country to another.[7] Like many other criminal prohibitions, kidnapping laws have evolved parallel to changes in human behavior. Kidnapping today scarcely resembles the common

---

[6] Appellant Swan also argues that because his conduct does not meet the definition for kidnapping, his felony murder conviction (premised on kidnapping) must also be vacated.

[7] 4 WILLIAM BLACKSTONE, COMMENTARIES 216.

law kidnapping that involved stealing away another to a foreign land. Owing to geography, international takings understandably would be less present in early America than in Europe. Thus, many early American courts expanded the narrow scope of kidnapping to include any asportation of a victim, not just an international one. *See A Rationale of the Law of Kidnapping*, 53 COLUM. L. REV. 540, 541 (1953). Today, in some jurisdictions, including our own, asportation of a person need not take place at all, and mere detention is enough. *Id*.; *see, e.g.*, D.C. Code § 22-2001 (2012 Repl.).

Since as early as the 1950's, scholars have been warning that modern, extremely broad state and federal definitions of kidnapping would allow criminal defendants to be punished for two crimes for the same action and suffer severe penalties, once used to deter the unique crime of international and ransom kidnappings, when the defendant is actually guilty of a lesser or different crime.[8]

---

[8] *See, e.g.*, *A Rationale of*, at 556 ("[T]he practical effect of kidnapping law is to permit the imposition of additional sanctions when one of these other crimes is accompanied by a detention and asportation. Kidnapping law, therefore, is defensible only if an asportation or detention significantly increases the dangerousness or undesirability of the defendant's behavior. Consideration of the cases reveals that it does not."); John L. Diamond, *Kidnapping: A Modern Definition*, 13 AM. J. CRIM. L. 1, 1 (1985) ("The common law offense is now codified in state penal laws, but the language in these statutes is frequently ambiguous and potentially overbroad.").

The Model Penal Code (MPC), promulgated in 1962, proposed language with the precise goal of restricting the scope of kidnapping, so that it will not "sweep within its scope conduct that is decidedly wrongful but should be punished as some other crime" because such a broad scope "raises the possibility of cumulative penalties or of higher penalties for kidnapping even though the removal of the victim to another place was part and parcel of [another crime] and not an independent wrong.[9]" Many jurisdictions have adopted the MPC's kidnapping language.[10]

---

[9] MODEL PENAL CODE § 212.1 cmt. 1 (1980).

[10] The MODEL PENAL CODE reads as follows:

> A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:
> (a) to hold for ransom or reward for release, or as a shield or hostage; or
> (b) to facilitate commission of any felony or flight thereafter; or
> (c) to inflict bodily injury on or to terrorize the victim or another; or
> (d) to interfere with the performance of any governmental or political function.

MODEL PENAL CODE § 212.1.

Critical here is the "substantial distance" and "substantial period" language.

We now turn our attention to the statute in question here. The District's kidnapping statute reads:

> Whoever shall be guilty of, or of aiding or abetting in, seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction thereof, be punished by imprisonment for not more than 30 years.

D.C. Code § 22-2001.

While appellants were briefing this case, this court decided *Richardson v. United States*, 116 A.3d 434 (D.C. 2015). In *Richardson*, we conclusively held that "non-incidental" confinement is not an element of kidnapping in the District of Columbia. *Id*. at 440-41. The appellants in *Richardson* made a nearly identical argument to those made here: that the only detention committed was incidental to their other crimes and, therefore, they could not be convicted of kidnapping. *Id*. at 438. The *Richardson* appellants argued that it is unjust for the government to bring

a charge of kidnapping where the detention is not distinct from another offense. *Id*. Appellants make the same argument here and we must reject it again.[11]

Because *Richardson* expressly denies that the incidental nature of a detention is relevant to the sufficiency of a kidnapping conviction in the District, appellants' actions here would constitute kidnapping even if we found that the detention was only co-extensive with the assault on June 17th and the murder on June 18th.[12] Therefore, although we do recognize the current trend toward narrowly construing kidnapping statutes, and while appellants may wish this court to follow that trend, the court has not done so to this point, and as a panel of this court, we cannot disturb the current construction. *See M.A.P.*, *supra*, at 312.

---

[11] This court can avoid precedent only when it sits en banc. *See M.A.P.*, *supra*, at 312.

[12] We note that the conduct on June 17th appears to be a kidnapping even under a more narrow construction of the statute—the detention was not merely incidental to the assault but continued for a substantial time after the assault. On June 17th, Wilson and Spencer hogtied Mr. Scarborough and left him naked on the floor of his apartment. Mr. Scarborough was freed only when he was able to alert his neighbor and the neighbor cut the ropes with a kitchen knife.

## IV.    Merger

The Double Jeopardy Clause of the Fifth Amendment prohibits "multiple punishments for the same offense." *Lennon v. United States*, 736 A.2d 208, 209 (D.C. 1999).  It "compels merger of duplicative convictions for the same offense, so as to leave only a single sentence for that single offense." *McCoy v. United States*, 890 A.2d 204, 216 (D.C. 2006).  The government agrees that merger is necessary for many of the convictions.  Swan's two burglary convictions should merge, and his kidnapping conviction should merge with his felony murder conviction.  Spencer's four burglary convictions should merge into just two (one for each day) and his three murder convictions should merge into one felony murder conviction.  Following vacation of two of Spencer's burglary convictions, and two of the murder convictions, the conviction for burglary on the date of the murder should merge into the remaining felony murder conviction.  Spencer's kidnapping conviction may stand.  Wilson's four burglary convictions merge into just two (one for each day) and his June 18th kidnapping conviction merges into his felony murder conviction.

**V.    Conclusion**

Accordingly, the judgment in this appeal is, therefore, affirmed in part and remanded to the trial court for merger of the convictions in accordance with this opinion.

*So ordered.*