*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-774

SERGIO W. VELASQUEZ CARDOZO, APPELLANT,

v.

UNITED STATES OF AMERICA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-15152-16)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued September 17, 2020                    Decided July 29, 2021)

*Matthew B. Kaplan*, with whom *Joseph Virgilio* was on the briefs, for appellant.

*Nicholas Coleman*, Assistant United States Attorney, with whom *Jessie K. Liu* and *Timothy J. Shea*, United States Attorneys at the time the briefs were filed, and *Elizabeth Trosman*, *Peter Taylor*, *Bianca M. Forde*, and *Kristina L. Ament*, Assistant United States Attorneys, were on the briefs, for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and STEADMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* MCLEESE.

Concurring opinion by *Associate Judge* DEAHL at page 22.

MCLEESE, *Associate Judge*: Appellant Sergio Velasquez Cardozo appeals from his convictions for kidnapping and several sexual-abuse offenses, arguing that the evidence was insufficient to support his convictions and that certain of his convictions should merge. We affirm in part, reverse in part, and remand for further proceedings.

## I.

Viewed in the light most favorable to the verdict, the evidence at trial was as follows. At around 1:00 a.m. one night in September 2016, E.R. was walking home. A police officer patrolling in the area saw E.R. walking hurriedly, and also saw Mr. Cardozo walking behind E.R., closing the distance between them. The officer then saw Mr. Cardozo "bear hug" E.R. Mr. Cardozo appeared to put one or both of his hands on E.R.'s breasts, move his hands along E.R.'s body, and then rub his hands on E.R.'s buttocks. When Mr. Cardozo grabbed E.R., she stopped for a "split second." After stumbling, she shrugged her shoulders and moved her elbows back, apparently to get away, at which point Mr. Cardozo turned around and walked in the opposite direction.

E.R. described having been grabbed from behind. She had been unaware that she was about to be grabbed, and she had no prior opportunity to indicate that she did not wish to be touched by Mr. Cardozo. As Mr. Cardozo was holding her, she felt a hand reach across her chest and touch her breast, and she also felt a touch on her buttocks. E.R. moved her elbows to get away, and said "no." Mr. Cardozo said "[s]omething to the effect of 'you want this' or 'do you want this.'" E.R. was momentarily stopped from walking home while Mr. Cardozo grabbed her and held her back, but after she shrugged him off she was able to resume walking.

The officer approached E.R. and asked her if she knew Mr. Cardozo. When E.R. said that she did not, the officer stopped Mr. Cardozo and noticed that Mr. Cardozo's pants zipper was undone.

Mr. Cardozo testified that he had not been wearing his glasses, that he bumped into E.R. accidentally, that he did not grab E.R. for the purpose of sexual gratification, and that he had been unaware that his zipper was down.

The jury found Mr. Cardozo guilty of kidnapping, sexual abuse in the third degree (touching of clothed breast), sexual abuse in the fourth degree (touching of clothed breast), and misdemeanor sexual abuse (touching of clothed buttock).

**II.**

We turn first to Mr. Cardozo's challenges to the sufficiency of the evidence to support his convictions. We review de novo whether the evidence was sufficient,

> viewing the evidence in the light most favorable to sustaining the judgment, and making no distinction between direct and circumstantial evidence. Judicial review is deferential, giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. The evidence need not compel a finding of guilt beyond a reasonable doubt, and it need not negate every possible inference of innocence. Rather, proof of guilt is sufficient if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Fitzgerald v. United States*, 228 A.3d 429, 436-37 (D.C. 2020) (brackets, citations, ellipses, and internal quotation marks omitted). We conclude that the evidence was sufficient to support Mr. Cardozo's convictions for kidnapping and third-degree sexual abuse but was insufficient to support Mr. Cardozo's conviction for fourth-degree sexual abuse.

## A. Kidnapping

Among other things, D.C. Code § 22-2001 (2012 Repl.), generally referred to as the kidnapping statute, makes it a crime to "seiz[e]" another person and "hold[] or detain[]" that person "for ransom or reward or otherwise." D.C. Code § 22-2001 (2012 Repl.). Mr. Cardozo argues that the evidence is insufficient to support his conviction under § 22-2001. We conclude to the contrary.

Most of Mr. Cardozo's arguments at bottom rest on the theory that the incident was too transitory to amount to kidnapping. That theory is foreclosed by binding authority. *See, e.g.*, *Ruffin v. United States*, 219 A.3d 997, 1005 (D.C. 2019) ("This argument is not a new one. It has been made to us before, and we have rejected it. . . . [T]he argument is foreclosed by binding precedent.") (internal quotation marks omitted) (citing *Richardson v. United States*, 116 A.3d 434, 438-39 (D.C. 2015) (kidnapping statute "contains no exception for cases in which the conduct underlying the kidnapping is momentary")).

Mr. Cardozo relies on *Chatwin v. United States*, 326 U.S. 455 (1946), a case interpreting the federal kidnapping statute. In that case, the Supreme Court reversed a kidnapping conviction, holding that there had been no evidence that the alleged

victim had at any point been restrained against her will. *Id.* at 460. The Supreme Court also stated that kidnapping "necessarily implies an unlawful physical or mental restraint *for an appreciable time*." *Id.* (emphasis added). Although the discussion in *Chatwin* does provide support for Mr. Cardozo's argument, that discussion is not a holding that is binding on us. Moreover, this court's subsequent cases require us to conclude in this case that the momentary nature of the seizure, holding, or detention is not a defense to a charge of kidnapping.

Mr. Cardozo also argues that he did not commit kidnapping because his conduct was coextensive with and incidental to his sexual assault on E.R. That argument is also contrary to binding authority. *See, e.g.*, *Spencer v. United States*, 132 A.3d 1163, 1173 (D.C. 2016) (court's decisions "expressly den[y] that the incidental nature of a detention is relevant to the sufficiency of a kidnapping conviction in the District"); *Richardson*, 116 A.3d at 439 ("The plain language of the statute contains no exception for cases in which the conduct underlying the kidnapping is . . . incidental to another offense.").

Although Mr. Cardozo argues that cases such as *Ruffin* and *Spencer* are not controlling authority, we disagree. It is true that some of our prior cases addressing these issues arose in the context of deciding whether kidnapping and various other

offenses were the same offense for purposes of the Double Jeopardy Clause. *E.g.*, *Parker v. United States*, 692 A.2d 913, 915-16 (D.C. 1997). That circumstance, however, does not undermine the binding nature of our conclusions as to the elements of kidnapping. *See, e.g.*, *Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (internal quotation marks omitted). In any event, both *Ruffin* and *Spencer* involved challenges to the sufficiency of the evidence. *Ruffin*, 219 A.3d at 1002, 1005-06; *Spencer*, 132 A.3d at 1172-73.

Mr. Cardozo also argues that cases such as *Ruffin* and *Spencer* are not binding authority because they are contrary to prior controlling authority, such as *Sinclair v. United States*, 388 A.2d 1201, 1204 (D.C. 1978) (indicating that separate conviction for kidnapping will not lie if kidnapping is coextensive with and incidental to other crime of conviction). This court, however, overruled *Sinclair* and similar cases in *Byrd v. United States*, 598 A.2d 386 (D.C. 1991) (en banc). *See, e.g.*, *In re D.W.*, 989 A.2d 196, 206 (D.C. 2010) (*Sinclair* and similar cases have "been superseded by our more recent decision in *Byrd*"). Those cases thus are no longer good law. *See, e.g.*, *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (en banc court can overrule prior decisions of court).

Finally, Mr. Cardozo argues that there was insufficient evidence to permit the jury to find that he intended to seize, hold, or detain E.R. We conclude otherwise. The jury could reasonably infer that, when he intentionally "bear hugged" E.R. as she was walking, Mr. Cardozo intended to seize, hold, and detain E.R., at least briefly. *See generally, e.g.*, *Corbin v. United States*, 120 A.3d 588, 591 n.3 (D.C. 2015) ("[T]he jury was entitled to infer that appellant intended the natural and probable consequence of his acts knowingly done . . . .") (brackets and internal quotation marks omitted).

## B. Sexual Abuse

We also conclude that the evidence was sufficient to support Mr. Cardozo's conviction for third-degree sexual abuse but insufficient to support Mr. Cardozo's conviction for fourth-degree sexual abuse.

### 1. Sexual contact

Third-degree sexual abuse and fourth-degree sexual abuse both require proof that Mr. Cardozo engaged in or caused "sexual contact" with E.R. D.C. Code §§ 22-3004 and -3005 (2012 Repl.). Sexual contact is defined as "the touching with

any clothed or unclothed body part or any object, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." D.C. Code § 22-3001(9) (2012 Repl.). The United States thus was required to prove that Mr. Cardozo acted "with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person" when he touched E.R.'s breast.

The evidence in this case was that Mr. Cardozo grabbed or touched E.R.'s private areas, including placing his hand on E.R.'s breast and touching her buttocks; that Mr. Cardozo's pants zipper was undone when he was stopped just after he assaulted E.R.; and that as he touched E.R., Mr. Cardozo said "something to the effect of 'you want this' or 'do you want this.'" That evidence amply supported an inference that Mr. Cardozo's assault on E.R. was intended to gratify or arouse Mr. Cardozo's sexual desires. *See, e.g.*, *Harkins v. United States*, 810 A.2d 895, 901 (D.C. 2002) (jury could infer intent to gratify or arouse where defendant rubbed leg against complainant, rubbed complainant's thigh, touched complainant's buttock, and said "Give me a call sometime, baby."); *see generally Nkop v. United States*, 945 A.2d 617, 620 (D.C. 2008) (intent to gratify or arouse "may be shown by virtue of touching or attempting to touch a complainant's private area").

## 2. Force

Turning specifically to Mr. Cardozo's conviction for third-degree sexual abuse, we hold that the evidence was sufficient to establish the "force" element of that offense. The third-degree sexual-abuse statute prohibits, among other things, engaging in "sexual contact" with another person by "using force against that other person." D.C. Code § 22-3004(1). In pertinent part, force is defined as "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person." D.C. Code § 22-3001(5).

As previously noted, the evidence in this case was that Mr. Cardozo "bear hugged" E.R., causing her to stumble and momentarily stop walking forward; that Mr. Cardozo then touched E.R.'s breast and buttocks; and that E.R. moved her arms to get away from Mr. Cardozo. Although Mr. Cardozo's conduct was brief, a reasonable juror could find that Mr. Cardozo used physical strength sufficient to overcome resistance and to restrain. *See, e.g.*, *Underdonk v. Vannoy*, Civ. Act. No. 16-15, 2016 WL 7971320, at *17 (E.D. La. Sept. 12, 2016) (defendant was guilty of aggravated kidnapping, where defendant overcame victim's resistance by, among other things, holding "victim in a 'bear hug,' preventing her from raising her arms or getting free while he attempted to unbutton her pants"); *Campos v. State*,

No. 07-19-00207-CR, 2019 WL 6483305, at *1 (Tex. App. Dec. 2, 2019) (defendant convicted of unlawful restraint based on "bear hug").

### 3. Incapability

Fourth-degree sexual abuse can be committed in various ways. D.C. Code § 22-3005. In the present case, the United States prosecuted Mr. Cardozo on the theory that Mr. Cardozo knew or had reason to know that E.R. was "incapable" of "appraising the nature" of Mr. Cardozo's conduct, "declining participation" in the sexual contact, or "communicating unwillingness to engage in" the sexual contact. D.C. Code § 22-3005(2). Mr. Cardozo argues that the evidence was insufficient to support a conclusion that E.R. was incapable in any of these respects. We agree.

Whether Mr. Cardozo's conduct constituted fourth-degree sexual abuse turns in part on the meaning of the word "incapable." Because "incapable" is not defined in the sexual-abuse statute, we turn to ordinary language. Dictionaries define the term in various ways. *See, e.g., Incapable*, Merriam-Webster.com, www.merriam-webster.com/dictionary/incapable https://perma.cc/YGD5-WZT2 (last visited July 12, 2021) (definitions of "incapable" include "lacking capacity, ability, or qualification for the purpose or end in view" and "lacking legal qualification or

power (as by reason of mental incompetence)"); *Incapable*, *Oxford English Dictionary Online*, www.oed.com/view/Entry/93304 (last visited July 12, 2021) (definitions of "incapable" include "[n]ot having the capacity, power, or fitness for a specified function, action, etc.; unable" and "[d]estitute of, or deficient in, ordinary capacity or natural ability; incompetent; without natural qualification").

Some of those definitions seem to focus on permanent disability. It appears to be undisputed in this case, however, that temporary circumstances not involving long-term disability, such as being asleep or under the influence of drugs or alcohol, can constitute "incapab[ility]" for purposes of the sexual-abuse statute. A number of courts have reached that conclusion when interpreting their sexual-abuse statutes. *See, e.g.*, *United States v. LaVictor*, 848 F.3d 428, 456-57 (6th Cir. 2017) (person who is asleep or intoxicated by drugs or alcohol can be "physically incapable of declining participation in, or communicating unwillingness to engage in" sexual act); *cf. Thomas v. United States*, 59 A.3d 1252, 1255 (D.C. 2013) (fourth-degree sexual-abuse conviction based on sexual touching of sleeping person); *Travis v. State*, 98 A.3d 281, 293 (Md. Ct. Spec. App. 2014) ("The common law of rape has long recognized that engaging in sexual intercourse with a woman who is asleep is a form of rape."). We need not decide that issue in this case, however, because we conclude that there was insufficient evidence of incapability even assuming that

incapability can arise from temporary circumstances not involving long-term disability.

At the moment the sexual assault began, E.R. was clearly capable of appraising the nature of Mr. Cardozo's conduct, declining participation in the sexual contact, and communicating unwillingness to engage in that contact. In fact, E.R. immediately did all of those things. In that respect, this case is quite different from those involving sleeping or heavily intoxicated victims who are incapable at the moment a sexual assault begins. The United States argues, however, that the critical time is not the moment the assault begins but rather some unspecified moment before the assault begins. For several reasons, we are not persuaded by that argument.

First, nothing in the wording of § 22-3005(2) suggests a focus on incapability at some point earlier than the moment of the sexual contact at issue. To the contrary, the statute's wording seems to point towards the victim's capability at the time of the conduct at issue, which would often be the first point at which a victim would be in a position to appraise that conduct, decline to participate in it, or express unwillingness to engage in it.

Second, interpreting the statute to focus on some point earlier than the moment of the sexual contact would create significant interpretive difficulties. For example, it is not clear how far in advance of the sexual contact the victim's capability should be assessed. If Mr. Cardozo had said "I am going to sexually touch you" just before he grabbed E.R., would he be not guilty of fourth-degree sexual abuse? Or would his guilt depend on whether E.R. had sufficient time to physically react, by in some way declining or expressing unwillingness?

Third, fourth-degree sexual abuse is a five-year felony. D.C. Code § 22-3005. It is not clear why the line between it and misdemeanor sexual abuse should depend on whether the victim had a pre-assault opportunity to decline or express unwillingness. To illustrate concretely, imagine that E.R. had seen Mr. Cardozo at the last second, and had been able to say "Don't" just before Mr. Cardozo assaulted her. On the United States's view, Mr. Cardozo apparently would not have been guilty of fourth-degree sexual abuse in that scenario. That seems rather counterintuitive, because assaulting someone over their express objection does not seem to be substantially less serious than assaulting someone by surprise.

Fourth, the United States cites no legal support for its view that fourth-degree sexual abuse requires a pre-assault opportunity to decline or express unwillingness.

We have looked to statutory and case law from other jurisdictions, and we find no clear support for the United States's position. Some similar state statutes seem to focus on the victim's lack of awareness at the moment the sexual assault is being committed. *See, e.g.*, Alaska Stat. Ann. § 11.41.425(a)(1) (2021) (third-degree sexual assault includes circumstance in which offender engages in sexual contact with person who offender knows is "mentally incapable," "incapacitated," or "unaware that a sexual act *is* being committed") (emphasis added). The federal sexual-abuse statute uses language similar to that of the District of Columbia's fourth-degree sexual abuse statute. *See* 18 U.S.C. § 2242(2) (sexual abuse includes circumstance in which defendant "knowingly . . . engages in a sexual act with another person if that other person is--(A) incapable of appraising the nature of the conduct; or (B) physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act"). We have found no case interpreting the federal provision to require a pre-assault opportunity to decline or express unwillingness. To the contrary, as far as we have been able to determine, the cases applying this provision have involved victims who were asleep or intoxicated at the moment the assault began, who were deemed incapable because of their young age, or who had long-term disabilities. *See, e.g.*, *United States v. A.S.*, 939 F.3d 1063, 1081 (10th Cir. 2019) (holding that evidence was sufficient to support conviction for sexual abuse where victim was asleep and intoxicated when assault began).

Relevant authority from other jurisdictions presents an unclear and mixed picture. The pertinent offenses in other jurisdictions are often defined and structured differently from the sexual-abuse provisions in this jurisdiction, and they take varying approaches. We have already noted that some state statutes seem contrary to the approach advocated by the United States. There also is additional support for taking a narrower approach to the concept of incapability or related concepts. *See, e.g.*, Okla. Stat. Ann. tit. 21 § 1111 (2021) ("rape" includes circumstances where "victim is incapable through mental illness or any other unsoundness of mind, whether temporary or permanent, of giving legal consent"). There also is some support, however, for the conclusion that lack of awareness due to surprise can properly be viewed as a form of incapability for purposes of sexual offenses. *See, e.g.*, *State v. Dickerson*, 609 S.W.3d 839, 845 (Mo. Ct. App. 2020) ("Missouri cases as far back as the early twentieth century acknowledge the breadth of what evidence may support a jury's finding that a victim is incapable of consent.") (citing *State v. Atkins*, 292 S.W. 422, 426 (Mo. 1926), for proposition that incapability to consent can exist where victim "is awake but surprised by the defendant's sexual assault with no opportunity to consent"); Mont. Code Ann. § 45-5-501(1)(b)(iii) (2021) (defining "incapable of consent" to include circumstance in which victim is "overcome by . . . surprise").

Finally, we have reviewed the legislative history of the District of Columbia's sexual-abuse provisions, and we find that legislative history to be inconclusive. On one hand, the specific references in the legislative history seem to reflect a focus on victims who are incapacitated by unconsciousness or disability. D.C. Council, Report on Bill 10-87 at 15 (Sept. 29, 1994) (explaining that, under existing law, element of force could not be established in cases where "the sexual act is committed upon an unconscious person, or upon a person unable to resist or withhold consent"); *id.* at 4 (stating that, under new law, "[i]ncapacitated or disabled victims would also be protected"). On the other hand, "[i]t is not the law that a statute can have no effects which are not mentioned in its legislative history." *Roberts v. United States*, 216 A.3d 870, 879 (D.C. 2019) (internal quotation marks omitted). Moreover, the committee report repeatedly emphasizes the intent to broaden the scope of the sexual-abuse laws. *See, e.g.*, Report at 1 ("Current laws and procedures in the District of Columbia which govern sexually abusive conduct are too narrow, inflexible[,] and restrictive -- leaving a significant number of D.C. residents unprotected from various forms of sexual abuse."); *id.* (new statute will "make the laws governing sexually abusive conduct more inclusive, flexible[,] and reflective of the broad range of abusive conduct which does in fact occur"); *id.* at 3 (under existing law, "serious sexual offenses -- which are not covered by the existing rape

statute -- are being prosecuted or perceived by juries as generic crimes of a less serious nature").

Taking these considerations together, we conclude that the better reading of the fourth-degree sexual abuse provision at issue in this case is that the United States must prove that, at the moment the sexual contact began, the victim was incapable of appraising the nature of the conduct, declining participation in that contact, or communicating unwillingness to engage in that contact.  D.C. Code § 22-3005(2). As we have already explained, E.R. in this case was not incapable in any of those respects at the moment the sexual contact at issue began.  To the contrary, she immediately understood that she was being sexually assaulted, declined participation in the contact, and communicated unwillingness to engage in the contact.  We therefore hold that the evidence was insufficient to support Mr. Cardozo's conviction for fourth-degree sexual abuse.

## III.

Mr. Cardozo claims that several of his convictions should merge because they are the same offense for purposes of the Double Jeopardy Clause.  The United States concedes that Mr. Cardozo's conviction for misdemeanor sexual abuse merges with

his conviction for third-degree sexual abuse.  We accept that concession.  Also, we need not address merger issues relating to fourth-degree sexual abuse, because we have already reversed Mr. Cardozo's conviction of that offense on other grounds.

Mr. Cardozo argues that his conviction for third-degree sexual abuse merges with his kidnapping conviction.  We conclude otherwise.

"The Double Jeopardy Clause protects against multiple punishments for the same offense." *In re M.S.*, 171 A.3d 155, 158 (D.C. 2017) (internal quotation marks omitted).  In determining whether a single act can permissibly be punished under two different statutory provisions, this court has generally adopted the elements test established by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  *In re M.S.*, 171 A.3d at 158.  That test "applies unless the legislature has clearly indicated a contrary intent with respect to the particular offense at issue." *Id.*  Under the *Blockburger* test, the question "is whether each provision requires proof of a fact which the other does not." *Id.* (internal quotation marks omitted).

To sustain a conviction for third-degree sexual abuse, the United States must prove, among other things, that the defendant "engage[d] in or cause[d] sexual contact with or by another person." D.C. Code § 22-3004.  Kidnapping does not

require sexual contact. D.C. Code § 22-2001; *In re D.W.*, 989 A.2d 196, 207 (D.C. 2010). Conversely, kidnapping requires proof that the defendant either intended to or did "hold[] or detain[]" the victim, but third-degree sexual abuse has no such element. *Compare* D.C. Code § 22-2001 *with* D.C. Code § 22-3004. *See, e.g.*, *Bryant v. United States*, 859 A.2d 1093, 1108 (D.C. 2004) (holding that kidnapping does not merge with first-degree sexual abuse; "detention is not an element of sexual abuse").

To the extent that Mr. Cardozo argues that merger is required because the conduct underlying his kidnapping conviction was coextensive with the conduct underlying his conviction for third-degree sexual abuse, we have already explained that controlling authority is to the contrary. *See supra*, at 6.

For the foregoing reasons, we affirm Mr. Cardozo's convictions for kidnapping and third-degree sexual abuse and reverse Mr. Cardozo's convictions for fourth-degree sexual abuse and misdemeanor sexual abuse. The case is remanded for the trial court to issue judgment accordingly. Because Mr. Cardozo's sentence for misdemeanor sexual abuse runs consecutively to his other sentences, the trial court is free to resentence on the remaining counts if it wishes to do so. *E.g.*, *Thorne v. United States*, 471 A.2d 247, 249 (D.C. 1983).

*So Ordered.*

DEAHL, *Associate Judge*, concurring:  In the District of Columbia, to grab somebody is to kidnap them.  An unwanted touching that breaks another's stride—be it to stop them from walking into oncoming traffic, to alert them to a dropped wallet, or to steady oneself (or another) amidst a stumble—is punishable by thirty years in prison.  As the government puts it, kidnapping includes all contacts "obstructing or forcing the movement of another without their consent."  I agree that our precedents compel those remarkable conclusions, despite being at odds with the English language.  But our precedents embrace an indefensible reading of the kidnapping statute.  This is an absurdity of our own invention, not the legislature's, and we ought to do away with it.  I write separately to urge my colleagues to reconsider this issue en banc.

Through our untenable interpretation of the kidnapping statute, this court has given the government license to tack a thirty-year offense onto virtually all assaultive (and some non-assaultive) acts, many of which the legislature has deemed misdemeanors punishable by no more than 180-days' confinement.  We can expect even the most stalwart of innocent persons to plead guilty to those lesser offenses whenever the government dangles this thirty-year sword over their heads.  The government insists it will keep its newly-forged sword sheathed and wield it only

when justice demands.  This case—in which it acknowledges the "technical nature" of this split-second kidnapping—demonstrates otherwise.

# I.

## A.

Cardozo's argument about how best to interpret our kidnapping statute "is not a new one" and "is foreclosed by binding precedent."  *Ante* at 5 (quoting *Ruffin v. United States*, 219 A.3d 997, 1005 (D.C. 2019) (citing *Richardson v. United States*, 116 A.3d 434, 438-39 (D.C. 2015))).  For that reason alone, I agree we must affirm his kidnapping conviction.

## B.

The District's kidnapping statute, as the majority recounts, makes it a crime to "seiz[e]" another person and "hold[] or detain[]" them "for ransom or reward or otherwise."  D.C. Code § 22-2001 (2021 Supp.).  The critical question is what the statute means by hold or detain.  Those words, depending on their context, can have very different meanings.  Consider two statements: (1) the United States should not detain children at the Mexican border, and (2) a chatty colleague detained me at

work. The second usage is compatible with the fleeting notion of holding or detaining, but not the first. A reasonable person would not speak or understand the first statement as an assertion that children should not be obstructed or delayed at the border, even for a passport or security check. Conversely, a reasonable person would not understand the second statement as an assertion that the chatty colleague held me in captivity. When we talk about detention in the first sense—like when we talk about "enemy combatants . . . detained" in Guantanamo Bay, Cuba,[1] or the "detention of those of Japanese ancestry" during World War II[2]—we do not mean momentary obstructions to free movement. What we mean is holding somebody captive.

Cardozo's conduct here admittedly fits within *some* ordinary meanings of the words hold and detain. But the opposite is also true: perfectly ordinary usages of those same words do not describe Cardozo's conduct. *See, e.g.*, *Hold*, BLACK'S LAW DICTIONARY 848 (10th ed. 2014) ("To keep in custody"); *Detention*, *id.* at 543 ("The act or an instance of holding a person in custody"); *Detention*, Webster's Third New International Dictionary 616 (2020) ("a holding in custody"); *see also Custody*, *id.*

---

[1] *Boumediene v. Bush*, 553 U.S. 723, 732 (2008).

[2] *Korematsu v. United States*, 323 U.S. 214, 221 (1944).

at 559 ("imprisonment or durance of persons").[3] There can be no serious debate that when Congress enacted this statute proscribing kidnapping and making it punishable by a lifetime in prison,[4] it intended to proscribe protracted custody, not brief seizures. It is simply not a hard question. While I think any familiarity with the English language's concept of kidnapping compels that result, I will belabor the point with seven reasons why our precedent is wrong.

### 1. The Text and Structure of the Statute

The District's kidnapping statute prohibits "seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away [of] any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise." D.C. Code § 22-2001. To break that down, the offense consists of: (1) a predicate act, as set forth in the initial list of nine verbs; (2) a culminating act, "holding or detaining," which can

---

[3] Dictionary definitions contemporaneous with the statute's operative amendment, *see infra* Part I.B.5, are in accord. *See, e.g.*, *Hold*, BLACK'S LAW DICTIONARY 896 (3d ed. 1933) ("to keep in custody or under an obligation"); OXFORD ENGLISH DICTIONARY, 468 (Supp. 1933) ("To detain in custody, keep under arrest").

[4] The modern iteration of the kidnapping statute was initially passed as a lifetime offense, S. REP. No. 72-846, at 2 (1932), though it has since been reduced to a thirty-year offense. *Infra* Part I.B.4.

be inchoate (an "intent to hold or detain" will do); and (3) a purpose, "for ransom or reward or otherwise."

The statute's text and structure indicate that the culminating act of holding or detaining means something more than the predicate acts of "seizing," "confining," "carrying away," and the like. Otherwise there is no reason for it to be layered on as a second and standalone requirement. Under our current interpretation, if a person is seized, confined, or carried away, they have perforce also been held or detained, rendering that second and separate element of the offense superfluous in the mine run of cases. It is "one of the most basic interpretive canons" that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *See Corley v. United States*, 556 U.S. 303, 314 (2009) (citations omitted). Most of the predicate act verbs—excepting the rarely-invoked "inveigling, enticing, [and] decoying"—subsume a "holding or detaining" under our precedent's current interpretation of those terms. If holding or detaining meant nothing but a mere seizure, the statute's first two requirements could have been captured in fewer than half its words: Congress might have said kidnapping proscribes "seizing another, or inveigling, enticing, or decoying them with an intent to do so . . ."

The statute's purpose requirement also indicates that the detention must be of a duration permitting the kidnapper to extract a ransom.[5] The "holding or detaining" requirement, when originally enacted, was accompanied by the requirement that it be done for "ransom or reward" in order to qualify as a kidnapping (the "or otherwise" was not added until several decades later, as discussed *infra* in Part I.B.5). A ransom or "reward implies something *given in return* for good or evil done," *Gooch v. United States*, 297 U.S. 124, 126 (1936) (interpreting federal kidnapping statute proscribing identical conduct, *see infra* Part I.B.2) (emphasis added), so that the holding or detaining must at least be of a type that could extract a ransom, even if that is not the particular purpose of the given kidnapping. *See Ransom*, Webster's, *supra*, at 1882 ("a payment that releases from captivity"). The split-second kidnapping Cardozo was convicted of does not fit that mold. A ransom takes some

---

[5] As does its title: "Kidnapping." "[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. Nat'l Ctr. For Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (citations omitted). We should presume—absent some clear indication to the contrary—that Congress outlined the elements of a kidnapping in a way that comports with common understanding. "While it is possible for a statutory definition to deviate from the normal meaning of a word, there is a strong presumption against it because 'counterintuitive definitions are a bane.'" *Sivaraman v. Guizzetti & Assocs.*, 228 A.3d 1066, 1075 (D.C. 2020) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts, 232 (2012)).

time to demand and procure and Cardozo could not conceivably have extorted one during this split-second seizure.

## 2. The Supreme Court's Guidance

The Supreme Court has made clear that our current precedent is misguided. In *Chatwin v. United States*, 326 U.S. 455, 456-57 (1946), the Court examined the federal kidnapping statute, which is identical in relevant part to the District's own.[6] *Compare* 18 U.S.C. § 408a (1934) (now-18 U.S.C. § 1201 (2018)), *with* D.C. Code § 22-2001; *see also United States v. Wolford*, 444 F.2d 876, 879 (D.C. Cir. 1971) ("For all practical purposes, the conduct prohibited by [the District's kidnapping statute] is identical to that proscribed by the Federal Kidnaping Act . . . with the exception of the requirement of the federal statute that the victim be transported in interstate or foreign commerce.") (footnote omitted).

---

[6] Our kidnapping statute is in "conformity with the corresponding federal act defining kidnapping," *Sinclair v. United States*, 388 A.2d 1201, 1206 (D.C. 1978), aside from the latter's interstate asportation requirement, 18 U.S.C. § 1201(a)(1). Given the parallel, "decisions of United States courts . . . provide . . . authoritative" guidance on the issue. *Sinclair*, 388 A.2d at 1206; *see also Corley v. United States*, 416 A.2d 713, 714 (D.C. 1980) ("[W]e look to the interpretation of the federal statute for guidance in determining the construction of our own statute since it was based on the federal provision.").

*Chatwin* emphasized that there was no "indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the Act, might be applied to those guilty of immoralities lacking the characteristics of true kidnapings." 326 U.S. at 464. It also cautioned against a "loose construction of the statutory language," noting that "the broadness of the statutory language does not permit [courts] to tear the words out of their context." *Id.* Were a court "to sanction a careless concept of the crime of kidnaping," as our court has, "the boundaries of potential liability would be lost in infinity." *Id.* With these principles in mind, the Court concluded that the federal kidnapping statute "necessarily implies an unlawful physical or mental restraint *for an appreciable period*." *Id.* at 460 (emphasis added).

Even assuming *Chatwin*'s pronouncements are non-binding dicta, "certainly dicta of the United States Supreme Court should be very persuasive." *Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963) (quoting *Fouts v. Maryland Cas. Co.*, 30 F.2d 357, 359 (4th Cir. 1929)). In fact, we have previously endorsed this dicta. *Robinson v. United States*, 388 A.2d 1210, 1212 n.5 (D.C. 1978);[7] *see also United*

---

[7] In *Robinson*, we noted that a victim "dragged . . . approximately 63 paces" had not been restrained for an appreciable period, 388 A.2d at 1212-13 & n.5; *see also Appreciable, Oxford English Dictionary Online*,

*States v. Sinclair*, 388 A.2d 1201, 1204-05 (D.C. 1978) (issued the same day as *Robinson*, and rejecting "unduly expansive" reading that contemplated "short and momentary removals").[8]  Yet six years ago, we brushed by *Chatwin*'s warnings without so much as a mention. *Richardson*, 116 A.3d at 439.  Despite the appellants'

---

www.oed.com/view/Entry/9784 (last visited July 10, 2021) ("of a significant extent or degree").

[8] In *Byrd v. United States*, 598 A.2d 386, 390-91 (D.C. 1991) (en banc)—a case that was not about and did not mention the word kidnapping—we rejected the merger analysis endorsed by *Robinson* and *Sinclair*. *See Richardson*, 116 A.3d at 439 (noting *Byrd* overruled *Robinson*'s approach to determining "whether offenses should merge").  In doing so, we did not comment on those opinions' construction of the kidnapping statute or their endorsement of *Chatwin*'s pronouncement that kidnapping requires a restraint for an appreciable period. *Sinclair* says expressly that the evidence was sufficient to support a kidnapping conviction only because it could not "be deemed a detention approximately coextensive or a necessary incident to" another crime.  388 A.2d at 1207-08.  That is an express holding on the evidence's sufficiency under the statute, so I disagree with the majority's assessment that *Byrd*'s merger analysis abrogated that statutory construction in any way. *Ante* at 7.  Because we have never revisited the issue en banc, *Sinclair* arguably remains good law. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court . . . , such result can only be accomplished by this court en banc.") (footnote omitted).  But *Richardson* rejected this very argument, so I think it is precedent on precedent and consider *Richardson* binding on the point. *See generally Parker v. K & L Gates, LLP*, 76 A.3d 859, 880 (D.C. 2013) (McLeese, J., concurring) (it is "an open question how the court should proceed when faced with a perceived conflict between the holding of an earlier decision and the holding of a later decision that has expressly addressed the earlier decision").  This is just one respect in which I think *Richardson* was wrong, and this conflict in our precedents is yet another reason to rehear this case en banc. *See* D.C. App. R. 35(a)(1) (en banc rehearing favored when "necessary to secure or maintain uniformity of the court's decisions").

heavy reliance on *Chatwin* in that case,[9] we concluded the "plain language of the statute" includes "momentary" kidnappings and ignored *Chatwin* altogether. *Id.* at 439-40.

### 3. Avoiding Absurdity in Statutory Construction

Our precedents run afoul of our duty to avoid absurd statutory interpretations. When one possible interpretation "would lead to absurd consequences which the legislature could not have intended," we ordinarily reject it. *James Parreco & Son v. D.C. Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989) (citing *United States v. Brown,* 333 U.S. 18, 27 (1948)); *accord Holt v. United States*, 565 A.2d 970, 972 (D.C. 1989) (en banc). We shun "interpretations that lead to unreasonable results." *Grayson v. AT&T Corp.,* 15 A.3d 219, 238 (D.C. 2011) (en banc) (internal quotes omitted). That is true even when doing so rejects the most natural reading of a statute. *Moten v. United States*, 81 A.3d 1274, 1277 (D.C. 2013) ("[I]f a 'literal interpretation of the statute would lead to an absurd result, the court will follow the legislative intent despite literal wording.'") (quoting *Haney v. United States*, 473

---

[9] *See generally* Brief of Appellant Walker, Richardson, 116 A.3d 434, No. 12-CF-1409, 2013 WL 10934488, at *16-35 & n.28; Reply of Appellant Walker, Richardson, 116 A.3d 434, No. 12-CF-1409, 2014 WL 10288770, at *2-13.

A.2d 393, 394 (D.C. 1984)); *James Parreco & Son*, 567 A.2d at 46 (when confronted with absurdity we "do not wallow in literalism" but "follow[] that [statute's] purpose"). Though in this instance, rejecting the absurdity embraced by our current precedents would in fact conform to the most natural reading of the statute. *Infra* Part I.B.1-2.

As the government accurately puts it, our precedents instruct that all contacts obstructing or forcing the movement of another without their consent are kidnappings. The good Samaritan who grabs an inattentive person to stop them from walking into oncoming traffic, turns out to be a kidnapper. Impatient commuters on the Metrorail who jostle others in the mad dash for the door, kidnappers all. If you stumble and intentionally grab another to steady yourself—or see another stumbling and steady them—you have kidnapped them. Holding somebody back from a fight, surprising an old friend with an unforeseen hug, grasping another to alert them to a dropped wallet—kidnapping, kidnapping, kidnapping. Kidnappings abound in our daily lives in the District. As if marauders in a dystopian hellscape, our past kidnappings are too many to count, and our future transgressions are inevitable.

If someone refers to a kidnapping in STAR WARS EPISODE V – THE EMPIRE STRIKES BACK, Darth Vader having Han Solo frozen in carbonite for about a year

comes to mind. But our precedents instruct that Han did some kidnapping of his own earlier in the film: just before he kisses Princess Leia, he grabs her hand despite her protestations to "stop that." Or take CHINATOWN, a film in which only the astute follower of our precedents will notice that just before uttering the iconic, "Forget it Jake, its Chinatown," Walsh kidnaps Jake by forcibly leading his friend away from the scene (so that he cannot go after the film's villain, who is spiriting away his daughter/granddaughter after causing her mother/sister to be killed). Same with "Frankly my dear, I don't give a damn." GONE WITH THE WIND. Scarlett O'Hara kidnaps Rhett Butler—grabbing his arm so as to turn him around—before he delivers that line. And when Michael Corleone seizes his brother by the back of the head and plants the kiss of death on him—"I know it was you Fredo. You broke my heart."— it turns out he kidnapped him (he would later have worse done to Fredo). THE GODFATHER: PART II. Somehow nobody has described those acts, in four of the most iconic and widely-discussed scenes in cinematic history, as kidnappings. That is an absurdity only our precedents embrace.

The government acknowledged the absurdity at trial, explaining to jurors "that in D.C. the kidnapping statute is *much broader* than what we typically think of as that classic kind of kidnapping." It further concedes the point on appeal, describing the "technical nature of the kidnapping here." At trial, no witness described what

happened as a kidnapping; not E.R. or the arresting officer who witnessed the entire incident.

The jury displayed persistent disbelief in the charge. After being instructed (effectively) that a mere seizure is a kidnapping—that E.R. need not "have been held for any particular length of time," parroting *Richardson*, 116 A.3d at 439—the jury sought further clarification. In apparent disbelief of this court's conflation of the statutory terms, the lay jurors sent a note asking "is there a definition of 'seizure' or 'seized' . . . relative to 'held' (in regard to amount of time), or do they mean the same thing?" The trial court responded, over defense counsel's objection, that a seizure includes any "forceful action in which . . . [a] person is suddenly . . . grabbed," and that hold means "to have or maintain in one's grasp." The next day—still experiencing some cognitive dissonance over the counterintuitive charge—jurors thought the rub might lie in the phrase "forceful action," so they asked the court to define that. An exasperated court suggested it might respond with, "Use your common sense" and stop "trying to avoid deciding this case by asking for definitions of common-sense words."[10] I am more sympathetic to this jury's plight. We defied

---

[10] Instead, it responded with a circular (but perfectly accurate) explanation that "the forceful action required would be the amount of force necessary to accomplish the seizure and holding."

the definition of common-sense words when announcing that momentary seizures are kidnappings, and the jury quite understandably resisted that absurdity until forced into submission.

### 4. Statutory Penalties

The severe penalties attached to the District's kidnapping law provide more compelling evidence that the legislature did not intend it to apply to momentary seizures. Kidnapping is one of the most serious offenses in the D.C. Code. It is currently punishable "by imprisonment for not more than 30 years," § 22-2001, though up until fairly recently, it carried a potential of lifetime imprisonment. *See* Sentencing Reform Amendment Act of 2000, D.C. Act 13-406 § 4(g), 47 D.C. REG. 7249 (Aug. 2, 2000). Kidnapping is a "Class A felony," and is one of the few enumerated offenses that a felony murder conviction can be predicated upon without proving that the defendant killed the victim "purposely." D.C. Code § 22-2101 (2012 Repl.).

Yet our interpretation of the kidnapping statute transforms virtually every battery, robbery, or groping, into a thirty-year offense, despite the legislature determining those offenses do not merit anything close to that sentence. While the American Law Institute opined that "the worst" abuses of kidnapping statutes punish

"behavior that amounts in substance to robbery or rape," MODEL PENAL CODE § 212.1, cmts. at 13-15 (AM. LAW INST. 1960), we have swept even lesser offenses into our statute's reach. *Cf. United States v. Etsitty*, 130 F.3d 420, 428 (9th Cir. 1997) (Kleinfeld, J., concurring) (Kidnapping, under the federal statute, "is not committed whenever someone is held against their will, as when one person grabs another to do harm, and the victim says 'Let me go.' . . . Were the statute read more liberally, Congress would have empowered prosecutors at their unfettered discretion to charge the same conduct . . . as a mere misdemeanor or a life imprisonment felony. Such unfettered prosecutorial discretion . . . would compel risk-averse people to plead guilty to any misdemeanor and even lesser felonies of which they were innocent.").

Consider simple assault, an offense punishable by no more than 180 days in jail. D.C. Code § 22-404 (2012 Repl.). While there are varieties of assault that need not involve a touching, the typical assault is a battery, i.e., "an intentional and unlawful, harmful or offensive, touching or use of force upon the physical person of another." *See Holder v. District of Columbia*, 700 A.2d 738, 743 n.6 (D.C. 1997) (citation omitted). To intentionally apply force to another against their will virtually always obstructs or forces their movement to some degree. Even acknowledging that an application of force need not necessarily do so—saving any discussion of

Newtonian physics for another day—I doubt the legislature meant to increase the punishment for that offense sixty-fold whenever the assailed is moved by the application of force. In fact, unlike assault, kidnapping does not require that the touching be harmful or offensive, only that it be unconsented to. *See* D.C. Code § 22-404. The aforementioned good Samaritan is thus not an assailant, but a kidnapper.

The same is true of the crime of jostling, which "contemplates a rough physical touching of one individual by another." *In re A.B.*, 395 A.2d 59, 62 (D.C. 1978). Jostling is punishable by a maximum of ninety days in jail, but only if it is done in a "public place," and "whereby a breach of the peace may be occasioned." D.C. Code § 22-1321(g) (2021 Supp.) Yet an industrious prosecutor might skirt those two minimal restrictions by charging a kidnapping, thereby lightening her evidentiary burden and increasing the potential sentence 120-fold in the process.

Through our construction of the kidnapping statute, we have ushered countless lesser offenses under the kidnapping umbrella and replaced their comparatively meek and legislatively-authorized sentences with a thirty-year authorization. *See Virgin Islands v. Berry*, 604 F.2d 221, 226 (3d Cir. 1979) ("The principal danger of overzealous enforcement of kidnapping statutes is that persons

who have committed such substantive crimes as robbery or assault which inherently involve the temporary detention or seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes."); *People v. Levy*, 204 N.E.2d 842, 844 (N.Y. 1965) (acknowledging that a broad definition of kidnapping "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes"); *State v. Stouffer*, 721 A.2d 207, 215 (Md. 1998) ("We recognize the problem articulated by the Third Circuit, New York, and California courts, among others, that a literal reading of the kidnapping law could have the effect of transforming a host of lesser-punished sex and street crimes into 30-year eligible kidnappings, and we do not believe that the Legislature ever intended for [Maryland's kidnapping law] to be read in that broad a fashion."); *United States v. Corralez*, 61 M.J. 737, 748 (A.F. Ct. Crim. App. 2005) (defendant's "brief holdings" of his girlfriend during two domestic disputes did not constitute kidnapping, noting that "turning these simple assaults, each punishable by a maximum of six months of confinement, into far more serious offenses . . . reflects precisely the 'careless concept of the crime' of kidnapping that has long been condemned as a misuse of the offense and sought to be avoided") (quoting *Chatwin*, 326 U.S. at 464).

### 5. *Legislative History*

The legislative history confirms what the text itself indicates. Our kidnapping statute dates back to 1933, when Congress amended a prior statute proscribing the crime of "abduction." It did so (alongside enacting a federal kidnapping statute) in the immediate wake of the 1932 kidnapping and murder of twenty-month-old Charles Augustus Lindbergh, Jr., aka, the "Lindbergh baby." *See generally* Horace L. Bomar, *The Lindbergh Law*, 1 LAW & CONTEMP. PROBS. 435 (1934); Robert C. Finley, *The Lindbergh Law*, 28 GEO. L.J. 908 (1940).

These amendments to the District's law made three notable changes. First, while the prior abduction statute did not apply to kidnappings of persons over the age of 16 unless the victim was "carried out of the District," *see* S. REP. No. 72-846, at 1 (1932), the amendments "close[d] this loophole" to bring purely intra-District kidnappings within its scope. *Id.* at 2. To that end, the new statutory language replaced "carries off or decoys out of the District" with the predicate and culminating act requirements described *infra* Part I.B.1. Second, they added the restriction that kidnappings be done for "ransom or reward," *id.*, denoting something more serious than "simple abductions without any ransom demands," Bomar, *supra*, at 442 n.44. *See also* S. REP. No. 72-846, at 1 (describing kidnapping as "the abduction *and*

holding for ransom") (emphasis added). Finally, they increased the maximum penalty from seven years (for the abduction of non-minors) to "imprisonment for life." S. Rep. No. 72-846, at 2. The amendments were meant to target the most heinous of abductions as epitomized by Lindbergh's case,[11] and to punish them as severely as possible.

And Congress was not writing on a clean slate. "Kidnapping originated as the common law crime of 'forcible abduction' or 'stealing away' of a person from one country to another." *Spencer v. United States*, 132 A.3d 1163, 1172 (D.C. 2016); 4 William Blackstone, *Commentaries on the Laws of England*, at 219 (21st London ed. 1852)). "Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Pasquantino v. United States*, 544 U.S. 349, 359 (2005) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)) (cleaned up). To be sure, Congress jettisoned one familiar feature of the

---

[11] Lindbergh was taken from the second-story nursery of his family home and his parents received at least thirteen ransom notes—typically demanding amounts ranging from $50,000 to $100,000 for his return—in the following months. A little more than two months after his kidnapping, Lindbergh was found dead—his head crushed and a hole in his skull—about four-and-a-half miles from his family home. *See* FBI, *Famous Cases: Lindbergh Kidnapping*, https://www.fbi.gov/history/famous-cases/lindbergh-kidnapping (last visited July 5, 2021).

common law crime of kidnapping, namely, crossing international (or even state) boundaries. But nothing in the text or history of our kidnapping statute suggests an intent to do away with the protracted custody and captivity that invariably accompanied such international abductions.

The notion that Congress intended to expand the definition of kidnapping to cover momentary seizures in its 1933 enactment is plainly at odds with the legislative record. As Representative Thatcher put it in the House, in describing the offense (he thought) Congress had proscribed: "No crime is more monstrous than is this one . . . [and] no penalty is too severe for those who perpetrate these unspeakable offenses against society and the home." 75 CONG. REC. 13325 (1932) (statement of Rep. Thatcher). While the Senate ultimately rejected the death penalty and authorized life imprisonment as the maximum penalty, it did so only after heated debate:

| | |
|---|---|
| Sen. Copeland: | I would send a man up for life, or for two lives, but I could never give my consent to imposing the death penalty. |
| Sen. Glass: | I would hang him so quickly he would not know what struck him. |
| Sen. Copeland: | I see you are bloodthirsty. |
| Sen. Glass: | You are for the deliberate abduction of little children. I am bloodthirsty because I want to |

kill a villain like that[?] . . . You say I am blood
thirsty because I want to electrocute them[?]

. . .

Sen. Kean:    [I]f he is electrocuted, that is the end of him, and
I am in favor of ending him then and there.

*Kidnapping Act: Hearing on S. 4694 Before the S. Comm. on the District of Columbia*, 72nd Cong. 13-15 (1932). Does that sound like they are talking about split-second bear hugs? Of course not. It took us more than eighty years after these congressional debates and amendments to divine otherwise.

### 6. Constitutional Avoidance and Vagueness

As we have interpreted the offense of kidnapping, it is prone to attack as unconstitutionally vague. While we have previously said it is not, *Khaalis v. United States*, 408 A.2d 313, 362 (D.C. 1979), that was back when we rejected the expansive reading of the statute as proscribing momentary seizures. *See Robinson*, 388 A.2d at 1212-13; *Sinclair*, 388 A.2d at 1205. The vagueness calculus changes dramatically if kidnapping encompasses the universe of split-second grabs that might just as readily be prosecuted as simple assaults or, more likely, go unprosecuted altogether. Just as a judicial "clarifying gloss" might save a statute from a vagueness challenge by "making it narrower or more definite," *Bouie v. City*

*of Columbia*, 378 U.S. 347, 353 (1964), erasing that gloss can resurrect a vagueness challenge from the dead.

"The prohibition of vagueness in criminal statutes . . . guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality opinion). It "require[es] that Congress, rather than the executive . . . , define what conduct is sanctionable and what is not." *Id.* "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

The legislature has provided no standards by which to measure which fleeting grabs are 180-day offenses and which are thirty-year offenses. Instead—if our current interpretation of the statute stands—it has left prosecutors and judges to do its work. It would seem Congress has impermissibly "set a net large enough to catch all possible offenders, and [left] it to the courts [and prosecutors] to step inside and say who could be rightfully detained, and who should be set at large . . . substitut[ing] the judicial [and executive] for the legislative department of

government." *Id.* at 358 n.7 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)); *Dimaya*, 138 S. Ct. at 1212 (plurality opinion) (same).

The government's attempts to assuage this concern only exacerbate it. It stresses that the kidnapping statute contains no mandatory minimum and so at sentencing a judge can distinguish between those kidnappings that really ought to be punished as such, and those that are mere technical kidnappings, like the one we confront here. It brushes aside concerns about its virtually-unbounded charging discretion of a thirty-year offense, pointing out that many statutes are broadly worded and allow a similar degree of charging discretion. That is wrong. There is no criminal statute close to as broad as the way we have interpreted this one, at least not one with nearly as drastic penalties attached to it.

In any event, the government's assurances are exactly what the vagueness doctrine is designed to guard against: it precludes "hand[ing] off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges," and leaving "people with no sure way to know what consequences will attach to their conduct." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). If you intentionally grab another's arm against their will, is that a 180-day assault or a 30-year kidnapping? The legislature has offered no input on that under our interpretation; it

is for the executive and judicial branches to sort out. In fact, less than two years after securing a five-year sentence for Cardozo's kidnapping here, the government agreed to reduce his sentence to time-served due to this kidnapping's "technical nature." Our interpretation of the statute has left to prosecutorial grace what is squarely in the legislature's province. It is difficult to see how it could survive a vagueness challenge,[12] and at the very least it needlessly tees up that serious constitutional question.

With that backdrop, constitutional avoidance also compels the rejection of our current interpretation of the kidnapping statute. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided," it is the court's "duty" to "adopt the latter." *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213

---

[12] Cardozo has not raised a vagueness challenge, though its facial viability factors into my statutory construction via the constitutional avoidance doctrine. Should we grant rehearing en banc, we have some discretion to address issues raised for the first time in en banc briefing, so that a vagueness challenge may yet be properly raised in this case. *Wilson-Bey v. United States*, 903 A.2d 818, 844 n.45 (D.C. 2006) (en banc) ("Because the government did make the argument in its brief to the en banc court, and because both appellants had ample opportunity to respond, we are prepared, in the exercise of our discretion, to entertain the government's argument on its merits.").

U.S. 366, 408 (1909); *accord Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1236 (D.C. 2016).

### 7. *Other Jurisdictions and a Variety of Better Approaches*

The year after *Richardson*, we acknowledged "a trend away from the District's current [and new] conception" of kidnapping. *Spencer*, 132 A.3d at 1172. But that understates the point. Never has a split-second kidnapping conviction been affirmed before today.[13] Many jurisdictions endorse a permutation of the Model Penal Code's test. *Id.* Under that test, a detention must be, among other things, "for a substantial period" to qualify as a kidnapping.[14] MODEL PENAL CODE § 212.1 (Kidnapping); *see, e.g.*, *State v. Wolleat*, 111 P.3d 1131, 1134 (Or. 2005) (en banc) (reading ambiguous statute to require confinement of "substantial period of time").

---

[13] Thwarted kidnappings or quick escapes do not counter this point, as our statute accounts for those by asking whether there was an "intent to hold or detain" the person in captivity. *See* D.C. Code § 22-2001. In cases like those, the relevant measure is how long the intended holding or detaining was, and never has a split second been thought long enough.

[14] The Model Penal Code obviates this requirement only where the victim is moved "a substantial distance" or if the person is removed from their residence or place of business. MODEL PENAL CODE § 212.1 (Kidnapping). While I read the plain language of our statute to mean that there is no kidnapping absent a detention for a substantial period akin to captivity, moving somebody a substantial distance tends to include detaining them for a substantial period.

As I have argued extensively above, a detention of a substantial duration—akin to what I have referred to as captivity and protracted custody—is a requirement that is not only consistent with our statute, but compelled by it.

At a bare minimum, we should require that a holding or detention be for a substantial duration before it qualifies as a kidnapping. That standard is administrable enough (though not ideal), as juries are routinely called upon to determine whether something is "substantial." When the government charges an attempted offense, for example, the jury must determine whether the defendant took a "substantial step" toward committing the offense. *Hailstock v. United States*, 85 A.3d 1277, 1283 (D.C. 2014). Likewise, determining whether defendants acted recklessly requires juries to determine whether they acted with conscious disregard of a "substantial and unjustified risk," "grave risk," or "extreme risk" of a particular harm. *Tarpeh v. United States*, 62 A.3d 1266, 1270 (D.C. 2013) ("substantial," "grave"); Criminal Jury Instructions for the District of Columbia, No. 4.201(B) (5th ed. rev. 2013) ("extreme").

That interpretive gloss is likely insufficient by itself. To make the standard more administrable, we should further draw a reasonable bright line that detentions of less than a certain period either do not, or are presumed to not, satisfy the holding

or detaining element of kidnapping.[15]  While picking a particular amount of time has a legislative feel to it, the Supreme Court has done likewise when confronted with analogously difficult line-drawing problems[16] and, in any event, our current approach does exactly that: we have simply picked an instant.  That is not only as arbitrary a line as any other, but far worse than many because it is plainly at odds with Congress's intent.  Imagine a statute, passed in the wake of 2010's "Snowmageddon," providing that no person shall drive on the roadways after a "blizzard or snowstorm" until those roadways have been reasonably cleared.  If the statute does not define "blizzard or snowstorm," how are judges to interpret those terms if pressed to define them?  They might do so loosely, such as "substantial snowfall in a short timeframe," or—if administrability and notice concerns are

---

[15] New York, for example, treats detentions "for a period of more than 12 hours" as fitting within its harshest 20-year first-degree kidnapping offense.  N.Y. Penal Law § 135.25(2).  Absent that, shorter detentions may qualify as first-degree kidnappings only if the offender intends to extort a ransom or reward from "a third person"—a caveat necessary to preclude every robbery from being a kidnapping— or if "[t]he person abducted dies during the abduction." *Id.* at § 135.25(1), (3).  That is in far better alignment with our own statute than our current precedents.

[16] *See, e.g.*, *Maryland v. Shatzer*, 559 U.S. 98, 110 (2010) ("We think it appropriate to specify" a particular time after which the invocation of the right to counsel under *Miranda* dissipates; "It seems to us that period is 14 days."); *County. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991) (stating government has 48 hours to bring a person arrested without a warrant before a court to establish probable cause).  It is no answer that *Shatzer* and *McLaughlin* were policing constitutional rather than statutory requirements, for we too would be policing the constitutional line that criminal statutes not be impermissibly vague.

weighty, as they are here—they might draw a clear and reasonable line, like snowfall of five-or-more inches over any twelve-hour period. It would be indefensible to demand a bright line, avoid drawing one for fear of imprecision (or "legislating from the bench"), and then declare that a blizzard or snowstorm entails any bit of snow. That would be contrary to the plain meaning of those words and the surrounding statutory text (roads will need to be cleared, after all); it also engages in the very line drawing it purported to reject while drawing the line in an unreasonable place. That is the model we have followed when interpreting our kidnapping statute. As surely as a snowflake is not a blizzard, momentary seizures are not kidnappings.

Even more jurisdictions adhere to a "non-incidental to another offense" requirement, and as I argue *infra* in note 8, there is a viable argument we remain among them. *See Berry*, 604 F.2d at 225-26 ("modern approach," as reflected in "the emerging body of law, and the all-but-unanimous view of the commentators," is to construe kidnapping statutes to not sweep in "lesser or different offenses, of which temporary seizure or detention played an incidental part."); *see also State v. Salamon*, 949 A.2d 1092, 1119 (Conn. 2008) (collecting cases). I admittedly do not see a basis for this requirement in our statute's text, and it strikes me as non-administrable. Though that is only a tentative view, reached without the benefit of briefing on the matter.

Jurisdictions interpreting federal analogs to our kidnapping statute tend to adopt a multi-factor test incorporating the factors discussed above. In those jurisdictions, whether a seizure rises to the level of a kidnapping depends on a host of considerations: "(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Berry*, 604 F.2d at 226–27; *see also United States v. Howard*, 918 F.2d 1529, 1534 (11th Cir. 1990) (same).

The particular proposal aside, the bottom line is: We could not do any worse. A "substantial period of time" test—even sans my preferred bright line or presumption—would be far superior to our current approach. As would the non-incidental and multi-factor tests adopted by other jurisdictions. It is inconceivable, based on all of the factors above, that Congress intended to proscribe momentary seizures through this kidnapping statute. Any administrability concerns are negligible—not to mention easily addressed—when the perfectly administrable approach we currently have regularly yields incorrect results, as it does here. The

persistence of hard questions is not a good reason to get the easy ones wrong.[17]
Under our current precedents, as vividly demonstrated by this case, we are getting the easy ones wrong.

\*      \*      \*

Our kidnapping precedents are of enormous impact and merit our en banc review. D.C. App. R. 35(a)(2) (en banc review generally reserved for "question[s] of exceptional importance"). It should go without saying that an incorrect statutory interpretation that would routinely transform misdemeanors into thirty-year offenses, contrary to the legislature's plain intent, is of exceptional importance. Its most pernicious impact is rarely confronted by the judges on this court, however, because it comes at the pre-trial plea bargaining phase. We have given the government carte blanche to append a kidnapping charge to virtually any assaultive act, and some non-assaultive ones. This is not the routine prosecutorial charging

---

[17] That is particularly true when we are getting them wrong in favor of imprisoning people that Congress did not intend to punish under this statute. It is "a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment." *Bell v. United States*, 349 U.S. 81, 83 (1955); *see also United States v. Bass*, 404 U.S. 336, 348 (1971) (lenity "embodies 'the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should'") (quoting H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in BENCHMARKS 196, 209 (1967)).

discretion the government describes.  I can think of no more important issue in need of revisiting.